# JANUARY TERM, 1899.

45  767
f46  444
45  767
58   43

## CHARLESTON.

STATE *v.* HULL.

(DENT, PRESIDENT AND BRANNON, JUDGE, *concurring.*)

Submitted November 30, 1898—Decided January 14, 1899.

1. EVIDENCE—*Incompetent Evidence—Criminal Law—Reversal.*
    Where illegal evidence is admitted against the objection of a
    party, it will be presumed that it prejudices such party; and if
    it may have prejudiced him, though it be doubtful whether it did
    or not, it will be cause for the reversal of the judgment; but, if it
    clearly appear that it could not have changed the result if it had
    been excluded, it will not be cause for reversing the judgment.
    (p. 777).

2. EVIDENCE—*Expert Testimony—Rape—Criminal Law.*
    A medical witness who is examined as an expert in the trial of an
    indictment for rape, after stating that he had been called upon
    to examine the prosecutrix, and the result of his examination,
    will not be allowed to express the opinion to the jury that no girl
    would have voluntarily submitted to the suffering necessary to
    have brought about this result.   (p. 774).

3. EVIDENCE—*Expert Testimony—Opinion Evidence—Criminal Law.*
    Where an injury relates to a subject which does not require
    peculiar habits of study in order to enable a man to understand
    it, the opinion of skilled witnesses is not admissible.   (p. 774).

4. EVIDENCE—*Expert Testimony—Opinion Evidence—Criminal Law.*
    While the admission in evidence of the opinions of experts
    necessarily give rise to very nice distinctions between facts and

findings, it nevertheless does not annul the rule of law, axio-
matic with reference to them, as well as to all witnesses, that
they must not be so examined as to substitute their opinions for
the verdict, and thus usurp the peculiar province of the jury. (p.
776).

Error to Circuit Court, Berkeley County.
Grant Hull was convicted of crime, and brings error.

*Reversed.*

FLICK, WESTENHAVER & BAKER, for plaintiff in error.

EDGAR P. RUCKER, ATTORNEY GENERAL, S. G. PITZER
and EDWIN M. KEATLEY, for the State.

ENGLISH, JUDGE :

On the 13th day of September, 1898, Grant Hull was
indicted in the circuit court of Berkeley County, for the
crime of rape, charged to have been committed upon one
Ella May Glessner. The plea of not guilty was interpos-
ed, and on the 16th day of September, 1898, a jury was
sworn in the cause. On the 17th of the same month they
found the prisoner guilty as charged in the indictment,
but recommended that he be punished by confinement in
the penitentiary, and, thereupon, the prisoner moved the
court to set aside the verdict and grant him a new trial,
which motion, after consideration, was, on the 4th day of
October following, overruled ; to which action of the court
the prisoner by his counsel excepted, and moved the court
to set aside the evidence. Judgment was rendered upon
the verdict, and the prisoner was sentenced to seven years'
confinement in the penitentiary; and thereupon the prison-
er applied for, and obtained, this writ of error. The errors
relied on by the prisoner are as follows :  (1)  The circuit
court should have set aside the verdict on the ground that
the *corpus delicti* was not sufficiently proved.  (2)  The
circuit court admitted improper testimony, against the ob-
jection of the defendant, materially prejudicial to the de-
fense, and for this, on motion, should have set aside the
verdict.  (3)  The circuit court should have set aside the
verdict of the jury, and awarded the defendant a new trial.
on the ground that the virdict was against the clear pre-
ponderance of the evidence.

Upon the question raised by the first assignment of error, as to whether the *corpus delicti* was sufficiently proved, the State necessarily relied upon the testimony of Ella May Glessner, who is discredited by her own story of the transaction; whose want of truthfulness appears to have been so notorious that her own mother would not believe her, as is shown by the letter written by her to Mrs. Hayes, in which, after speaking of the complaints her daughter had made against her, she says: "I want you to come immediately to see me. I want this talk stopped. I want the straight side of the story. * * * I want you to come right away, and tell me the straight thing of it. I know you will tell me the truth." The whole story of the alleged crime, as detailed by witnesses for the State, abound in inconsistencies and improbabilities. The girl who prefers this charge, and seeks to consign her stepfather to the gallows, or a long term of confinement in the penitentiary, out of spite, which appears to have been engendered by a letter written by her mother, exposing some of her falsehoods and fabrications in regard to the treatment she had received at the hands of the parties with whom she was making her home, begins her testimony with a statement which, although it may be immaterial, was regarded as important by her, which was that nobody started away from the prisoner's house with her; that the prisoner had gone away from the house to look at his potato patch,—he said he was going to look at it; she saw him go; was standing on the porch when he went out. On cross-examination she says: "I did not start with Grant. It was four o'clock when I started." She also says: "Grant asked Frank to go with him when he left. He said. 'No; I will go to the doctor's with you.' That was a half hour before I went to the house." This testimony is directly and plainly contradicted by several witnesses. First. Mrs. Mary Hull, the mother of the prisoner, testifies as follows: "I have made my home with the prisoner for several years. Was living there on Sunday, July 24th. It was twenty minutes past four o'clock when I came out of Mrs. Hull's room, and Ella left about four minutes after I came out. Grant and Ella went away together. He was a couple steps ahead." Mrs. Glessner also, in her testi-

mony, says: "I was at Hull's house on the Sunday in question, and Ella was there also. It was something after four o'clock when she left the house to return home. I was on the porch when she left. I didn't know who left first. Mr. Hull said, 'I will go a piece of the way with you,—as far as my potato patch.' She and he left together. I cannot say which was first." Frank Glessner, in his testimony, also says: "I was on the porch when they left [speaking of prisoner and Ella], and they went together." The only motive we can ascribe for this deliberated falsehood on the part of Ella is that she had accused the prisoner of making a similar assault upon her a year previous, and claimed to be afraid of prisoner on that account, and may have thought the story of former assault would be detracted from by her action in being too sociable and friendly with the prisoner. But, let the motive have been what it might, she stands flatly contradicted by three witnesses.

Following the testimony of this prosecuting witness, she says: "I met Grant the first time after leaving the house at Hedges' orchard, I went catty-cornered through the cornfield to the road, and Grant was in the road where it runs to the woods. The summer before this, Grant came down to Mrs. Hayes', and asked me if I could go up with him. He took me up through Ropp's woods, and tried to do the same thing. I hollered, and my mother came running up. He gave me a quarter, and I gave it to my mother." Now, when we turn to the testimony of Mrs. Grant Hull, she says: "I have heard the story of what Ella says happened a year before this occurrence. It is not true, nothing of the kind ever happened. I never heard anything of this kind." This witness says she told Mrs. Hayes about two months afterwards, but Mrs. Hayes, when on the witness stand, does not confirm her. Now, it is apparent that this story, which was brought out on cross-examination, was fabricated and detailed to account for the remarkable conduct on her part, which was described by her in detailing her evidence in chief. She says: "I met Grant near the end of Hedges' orchard. He was in the road. I shook hands with him, and give him good-bye, and asked him over. That was a field and a house distant from Grant's house. He said, 'All right'; he

might be over in a few weeks. He went on towards his home, and I went in the opposite direction." Now, after this friendly parting, the prisoner taking the road towards home, it is somewhat remarkable that in a few minutes afterwards he should be found pursuing her in McDowell's woods, and halting her in a threatening manner; telling her, if she did not halt he would kill her; and that she should take off her hat, and start to run fast. Would it not be more reasonable to suppose that if the prisoner had any such designs upon this girl, he would have walked along with her to McDowell's woods, instead of telling her good-bye, and starting on the road leading to his home? And even if he had pursued her, as she said he did, would he, after his recent friendly parting with the girl, have accosted her in the rude and threatening manner testified to by her? Such conduct would be not only unnatural, but foolish and unaccountable.

Coming next to the story this witness tells of what transpired in McDowell's woods, can you say it bears the impress of truth? She says: "He says, 'Come here!' and I says, 'No, sir.' I told him I must go home. And he walked up, and caught me by the arm, and says, 'Come up here in the woods; I have something pretty to show you.' And I says, 'No, sir.' And so he took me up in the woods, and done what he pleased. He caught hold of my dress sleeve, and pulled me along. I pulled and tore my dress sleeve. I hollered 'murder!' I jerked, and tried to get away from him, but he would not let me go.   *   *   * He was about half an hour doing it. He just took and done what he pleased, and he tore all my underclothes." Now, that this story was neither true nor well considered is apparent when we recur to the fact that she left the house of prisoner at four o'clock and twenty-five minutes. Mr. John D. Smith, in his testimony, says: "We left Spring Mills about five o'clock in the evening. She [Ella May] met us about one hundred yards below the cross roads at Spring Mills. We had started without her, and she met us." From Grant Hull's to Spring Mills, according to the testimony of Hunter Harlan, is one mile and a half, and the witness Decatur Hedges calls it two miles. It is a matter of common observation that a person walk-

ing in an ordinary gait will not walk more than three miles an hour. If, then, we consider the distance from the prisoner's to Spring Mills to have been one mile and a half, it would have taken the witness half an hour to have walked it; and, if this be so, how can we reconcile it with her story that she was detained in McDowell's woods for half an hour with the prisoner, or that she was detained there at all? This witness not only states that she was detained in McDowell's woods by the prisoner for half an hour, but Mrs. Hayes states that she told her on Thursday that prisoner had taken her in the woods, and kept her there a half hour, and what he had done to her. This witness also stated that Ella's dress was torn under the arm, and her underclothes were not very clean,—they had blood on them. No other part of her clothing was torn, which is another flat contradiction of Ella's testimony. Again, can we reconcile the deportment of this girl after she meets with the Smiths near Spring Mills, and proceeds on her way home with them, with the alleged fact that she had just been subjected to one of the grossest outrages that can befall women? The witness John G. Smith testifies that: "On the return trip home she acted the same as usual. She acted foolish and giddy, like all young people do. She was always wild and full of fun. She didn't appear either tired or worried after we got in the boat."

The logical conclusion resulting from this train of circumstances is that, while it may be true that some time previous to the finding of this indictment Ella May Glessner may have been robbed of her priceless jewel, it was not on Sunday evening, July 24, 1898, on her way from the house of the prisoner to Spring Mills. If the subsequent conduct and actions of this girl were inconsistent with the charge contained in the indictment, what must we say of the testimony of a negro boy,—Peter Johns? In looking at this testimony, we must not only take into consideration what any sane man who had been guilty of such an offense would have said or done under like circumstances, but we must look at the character and reputation of the prisoner, as appears from the testimony of the Presbyterian minister and five others. They all testify as to his being an honest an upright man. Also the statement of

said Johns on cross-examination that, although he lived about a mile from prisoner's, they were only acquaintances. He had only been to prisoner's house once. That they did not run together. Taking this view of the circumstances and conditions of the parties, can we regard it as within the bounds of possibilities that the prisoner, if he had been guilty, would have stopped on the road, and made a voluntary statement to this young negro boy that he had gone a piece with a girl, and committed an outrage upon her chastity against her consent, or even with it? The prisoner was within a short distance of his home, where his wife and children were. He stood well in the community as an honest, respectable man, and it is natural to suppose that he valued the reputation he had earned among his neighbors; and it is taxing our credulity too far to believe that, even if he had so far forgotten himself as to have been guilty of such conduct, that he would have made a confidant of this strange negro boy, and imparted to him a secret which might cost him his life or his liberty.

We come next to the consideration of the testimony of Dr. D. R. Ross, who testified that he "had occasion to examine Ella May Glessner on the 31st day of August, 1898." He says: "My examination was to determine whether an assault had been made upon her person. I found evidence of recent cohabitation, and that she had been injured by it. The parts were still swollen and conjested, and very tender. I found no other marks of violence. She was about a half-developed girl. The hymen was destroyed. That is all I know." On cross-examination he said: "There were no marks upon her except about her private parts. The indications were that several days,—three or four, at least—had elapsed since she received the injuries, as there was some sloughing. I could form no idea how long previously her virginity had been destroyed. It was evident that the injuries would not have happened to a person habitually accustomed to intercourse. The internal injuries would have been the same whether the intercourse was forced or by consent." On re-direct examination, and over the objection of the prisoner, this witness testified as follows: "I do not believe that any girl would have voluntarily submitted to the suffering necessary to have brought

about this result." Now, it is reasonable to suppose that the testimony of this physician, who had been called on to make the examination of this girl, would have great weight, and a controlling influence with the jury. The distinguishing feature of this heinous crime is that force should have been used in its commission. This medical witness had just stated that "the internal injuries would have been the same whether the intercourse was forced or by consent," and then, in response to a question propounded by the State, said, "I do not believe that any girl would have voluntarily submitted to the suffering necessary to have brought about this result." Did the circuit court err in allowing this answer to go to the jury over the objection of the prisoner? It required no science, or skill, or peculiar habits of study to reach the conclusion expressed in this opinion, after the facts were before them. Any man on the jury was as capable of arriving at a correct conclusion as this physician. In the case of *Welch* v. *Insurance Co.*, 23 W. Va. 305, GREEN, JUDGE, in delivering the opinion of the Court, says: "Of facts which require proof by indirect evidence, says Starkie: 'There are some of so peculiar a nature that juries cannot, without other aid, come to a direct conclusion on the subject. In such instances, where the inference requires the judgment of persons of peculiar skill and knowledge on the particular subject, the testimony of such as to their opinion and judgment upon the facts is admissible evidence to enable a jury to come to a correct conclusion. * * * But Starkie lays it down further that when the inquiry relates to a subject which does not require peculiar habits of study in order to enable a man to understand it, the opinion of skilled witnesses is not admissible; and he is unquestionably right in this position." We also find the law thus stated in Starkie, Ev. (9th Ed.) p. 755. "An expert cannot be asked to give his opinion upon doubtful facts in the case on trial which remain to be found by the jury, but a similar case may be hypothetically put to him, based upon the evidence in such case." This Court held in the case of *State* v. *Musgrave*, 43 W. Va. 673, (28 S. E. 814, syl. point 5): "The subject of all questions of experts should be to obtain their opinion as to matters of

skill or science which are in controversy, and at the same
time to exclude their opinions as to the effect of the evi-
dence in establishing controverted facts." Yet this medi-
cal witness was allowed to tell the jury that he did not be-
lieve any girl would have voluntarily submitted to the suf-
fering necessary to have brought about this result (that
is, the indications which he found). Did he not, by that
answer, tell the jury that, in his opinion, the result was
not accomplished with her consent, or—which is the same
thing—was done by force; in other words, that a rape had
been committed on this girl? If this prosecution was lack-
ing in this important element, required to constitute rape,
this witness was allowed to tell the jury that, in his opin-
ion, the act was committed against her consent, and, con-
sequently, by force.

Counsel for the prisoner cite the case of *Noonan* v. *State*,
55 Wis. 258, (12 N. W. 379), which, in point of facts,
closely resembles the case under consideration, which is
quoted from in the brief as follows: "A medical witness,
called on behalf of the state, who made an examination of
the prosecutrix several days after the rape was alleged to
have been committed, testified that on such examination he
found an aggravated inflammation of the uterus, vagina,
and other sexual organs of the prosecutrix. He was then
allowed, under objection by the plaintiff in error, to testify
that, in his opinion, such inflammation was produced by
her having connection (a violent, not a free, connection);
that is in substance and effect, that the inflammation was
the result of rape, which had been committed upon her.
The testimony here quoted was given in answer to the
questions put by judge: "To what do you attribute the
inflamed condition that you say you found? And the ques-
tion was duly objected to, and exception thereto taken.
The question and the answer which it elicited were clearly
incompetent. The witness was competent to state what
effects might result from a rape, but it was going far be-
yond the range of authorized expert testimony to allow him
to give an opinion that the inflammation he discovered was
produced by rape. On the cross-examination this witness
was constrained to admit—what any person of ordinary
intelligence knows without the aid of expert testimony—

that there are other adequate causes which might have produced such inflammation. It was for the jury to determine whether the inflammation which the witness testified to was the result of rape or some other cause, and the extent to which expert testimony affected that question could properly be resorted to would be to show what effects upon the sexual organs of the female might result had she been ravished; but the testimony admitted was a usurpation of the province of the jury, and beyond all question, its admission was error,"—citing *Luning* v. *State,* 2 Pin. 285; *Knoll* v. *State,* 55 Wis. 249 (12 N. W. 369); *Cook* v. *State,* 24 N. J. Law, 843. In 7 Am. & Eng. Enc. Law, p. 500, it is said, "A physician may testify what effect rape would have upon the sexual organs, and that on examination he found them inflamed," and in note 1, "but not that, in his opinion, such inflammation was produced by having violent connection;" citing *Noonan* v. *State, supra.* In 8 Enc. Pl. & Prac., p. 751, we find the law thus stated: "While the admission in evidence of the opinions of experts necessarily gives arise to very nice distinctions between facts and findings, it nevertheless does not annul the rule of law, axiomatic with reference to them as well as to all witnesses, that they must not be so examined as to substitute their opinions for the verdict, and thus usurp the peculiar province of the jury," citing *Gunter* v. *State,* 83 Ala. 96, (3 South 600). In the same work (page 771), speaking of expert witnesses, it is said: "The rule that an expert cannot be asked his opinion as to the merits of the case on trial is equally as applicable to his re-examination as to his examination in chief." The medical witness in this case not only expressed his opinion upon the merits when he stated that he did not believe that the prosecutrix would have voluntarily submitted to the suffering necessary to have brought about the result, but he invaded the province of the jury.

Now, without attempting to recapitulate the testimony, my conclusion is that its character is not such as to establish the *corpus delicti.* Bearing in mind the language of Lord Hale, who, in speaking of rape, says: "It must be remembered that it is an accusation easily made, but difficult to be disproved by the party accused, be he ever so

innocent," (1 Hale, P. C. p. 635), and also the maxim that the prisoner must be presumed innocent until his guilt is proved by competent evidence, I cannot refrain from referring for a moment to the earnestness and zeal displayed by the attorney for the state in attempting to overthrow the effect of the character shown by the prisoner for honesty and morality by asserting that the newspapers are constantly heralding to the world the fall of men high in church work, who have embezzled the funds of institutions, or robbed their Sunday school scholars of their virtue, and seeking to establish the rule by referring to such monumental exceptions as the case of Pearl Bryan, of Cincinnati, and Durrant, of San Francisco, in both of which cases murder was committed to conceal the first crime.    This attorney must have fully realized how important it was to his success in this prosecution to remove from his way the character which the prisoner had established by his minister and those that knew him best, and to bolster up the character of this innocent boy, who relates a story that bears on its face unreasonableness and improbability.    The prosecutrix has sworn to enough in this case to establish the prisoner's guilt if she had spoken the truth; but she has been contradicted in so many particulars that, to say the least of it, extreme doubt has been cast upon her testimony; and, considering the whole evidence,—as we are required to do by statute,—my conclusion is that the court erred in overruling the motion to set aside the verdict.

I am also of opinion that the court erred in allowing said medical witness, after stating that the result would have been the same whether the intercourse was forced or by consent, to testify that he did not believe that any girl would have voluntarily submitted to the suffering necessary to have brought about this result.    Was the prisoner prejudiced by this ruling?    In *State* v. *Musgrave, supra* (Syl. point 9), this Court held that: "Where illegal evidence is admitted against the objection of a party, it will be presumed that it prejudiced such party; and if it may have prejudiced him, though it be doubtful whether it did or not, it will be cause for the reversal of the judgment, but, if it clearly appear that it could not have changed the

result if it had been excluded it will not be cause of revers-
ing the judgment." But it does not appear, and we cannot
say, that this evidence, if excluded, would not have changed
the result. The opinions of this physician in a case of this
character would necessarily have great weight with a jury,
and we cannot say that this opinion, illegally and improp-
erly expressed in the presence of the jury, did not preju-
dice the prisoner, or that it did not control the verdict.
For these reasons the judgment complained of is reversed,
the verdict set aside, and a new trial awarded.

BRANNON, JUDGE, (*concurring*):

I agree to the syllabus. I agree that a new trial be
granted for the admission of improper evidence. But I do
not agree to all that part of JUDGE ENGLISH's opinion hold-
ing the evidence of the State's witnesses unworthy of
credit, and holding that the *corpus delicti* is not proven. I
do not think we ought to pass on the evidence, and thus
disparage and destroy the State's case in advance of a new
trial. What is the use of a new trial with the State's
evidence condemned in advance? My position is that that
part of JUDGE ENGLISH's opinion sets a bad precedent for
this Court. I hold that where this Court reverses for the
admission or rejection of evidence, or for giving or refusal
of instructions, or on any ground other than the weight or
credit of evidence, we should not pass on the weight or
credit of evidence, but remand the case for a new trial
without influence from an opinion of this Court branding
and condemning the evidence as not worthy of credit.
The evidence may not be the same on another trial; other
evidence may be brought in; and, if we brand the evidence,
it necessarily discounts the effect of the old evidence.
Need I cite cases to show that the jury is almost uncon-
trollably the judge of the credit of the witnesses? Yet
JUDGE ENGLISH makes a jury out of this Court, and makes
us brand witnesses as false whom twelve sworn jurors and
a judge believed, when they saw the witnesses, and enjoyed
great advantage in passing on their evidence, which we do
not possess, which JUDGE ENGLISH said gave them better
capacity to judge than we. *Sigler* v. *Beebe,* 44 W. Va. 592,

(30 S. E. 76).  I do not say that where a party's case turns only on weight of evidence we are not bound to consider it. We are so bound.  But when the party gets a new trial on other grounds, we ought not to pass on the evidence. Chapter 131, section 9, Code 1891, as construed in *Johnson v. Burns*, 39 W. Va. 658, (20 S. E. 686,) does not require us to do so where not necessary to give the party a new trial. And I am sure that act was not intended to utterly reverse the rule that made the jury peculiarly, and almost uncontrollably, the judge of the veracity of witnesses.  If we do pass on the evidence, we must say it establishes the case. And why?  Because the jury gave it credit, *Gilmer v. Sidenstricker*, 42 W. Va. 57, (24 S. E. 566); *Dudleys v. Dudleys*, 3 Leigh, 436, and because in *Akers v. De Witt*, 41 W. Va. 229, (23 S. E. 669,) it was held that, if the sole ground for new trial depends on credit of witnesses, this Court will not disturb the judgment.  Are we to usurp the jury power?  Is this great jury right from Magna Charta, imbedded in our bill of rights, to be frittered away?  If this doctrine is carried out, how far will it depreciate, or at last undermine, this right which we have all considered sacred?  The old rule of demurrer to evidence and motion for new trial preserved to the party the benefit of all his evidence conflicting with that of his opponent, and conceded credit to his witnesses; but, if we change this by denying credit to his witnesses, do we not deny him jury trial in effect?  I do not think that act goes so far.  If we so construe it, do we not make it unconstitutional?  We must give it a construction not making it run counter to the Constitution if possible.

Note by Dent, President: .

I concur in the result reached in this case and the syllabus, but dissent from that portion of Judge English's opinion that passes on the credibility of the witnesses, as this is an invasion of the province of the jury.  See *Akers v. De Witt*, 41 W. Va. 229, (23 S. E. 669).

*Reversed.*