STATE OF WEST VIRGINIA

*v.*

ERNEST STEVENSON

(No. 12129)

Submitted January 23, 1962.          Decided July 3, 1962.

HAYMOND, JUDGE, dissenting.

*Harry F. Thompson, Jr., Tom T. Baker*, plaintiff in error.

*C. Donald Robertson*, Attorney General, *Claude A. Joyce*, Assistant Attorney General, defendant in error.

BROWNING, JUDGE:

Ernest Stevenson, hereinafter referred to as defendant, was convicted of the offense of murder of the first degree in the Common Pleas Court of Cabell County on September 22, 1960. A motion to set aside the verdict and grant him a new trial was subsequently overruled and, the jury having failed to recommend in their verdict a sentence of life imprisonment, judgment was entered thereon sentencing the defendant to be executed on January 6, 1961. The Circuit Court of Cabell County, upon writ of error, affirmed that judgment to which action this Court granted a writ of error and supersedeas on September 18, 1961.

Perhaps a brief resume of the appellate procedure in this case is indicated. Section 1 of Article 8 of the Constitution of this State provides that "The judicial power of the State shall be vested in a supreme court of appeals, in circuit courts and the judges thereof, in such inferior tribunals as are herein authorized and in justices of the peace." Section 12 of Article 8 provides that circuit courts "shall have appellate jurisdiction in all cases, civil and criminal, where an appeal, writ of error or supersedeas may be allowed to the judgment or proceedings of any other inferior tribunal. . . ."

'The Common Pleas Court of Cabell County was created by statute pursuant to the provisions of the Constitution of this State and has jurisdiction in criminal matters. This Court held in *State* v. *McLane*, 128 W. Va. 774, 38 S. E. 2d 343, that there could be no direct review of a judgment of a court of limited jurisdiction and that the circuit court of the county wherein such court of limited jurisdiction sat had exclusive jurisdiction to review the judgments of such court.

Upon petition of the defendant, the Honorable John W. Hereford, Judge of the Circuit Court of Cabell County, granted a writ of error to the defendant to the final order of the Common Pleas Court of Cabell County, entered on the 14th day of October, 1960, and thereafter a supplemental petition for writ of error was filed by the defendant alleging certain misconduct of the jury during the trial. On January 6, 1961, the Circuit Court, after a hearing, "on said original petition and said supplemental petition," remanded the case "to the Common Pleas Court of Cabell County, West Virginia, for the purpose of determining and ascertaining the facts in connection with the alleged acts of misconduct raised by said supplemental petition, with affidavits attached, and to report such findings to this Court with the recommendation as to whether or not the alleged acts of misconduct are in the opinion of the said Common Pleas Court such acts of misconduct as would require" a new trial. Pursuant to the remand the Judge of the Common Pleas Court heard testimony upon that issue which covers 145 pages of the transcript of evidence before this Court. The Judge of the Common Pleas Court thereafter entered an order which stated in part ". . . that the alleged acts of irregularities and misconduct on the part of the Jury are not such as would warrant the setting aside of the verdict of the Jury in this case and so recommends". On the 26th day of April, 1961, the Circuit Court of Cabell County entered its order to which this Court has granted this writ of error in which that court found that "the judgment of said Common Pleas Court is just, proper and plainly right".

The errors relied upon by the defendant in this Court are: (1) The evidence is insufficient to support a verdict of

murder of the first degree; (2) In admitting in evidence a purported oral confession of the defendant; and (3) The alleged misconduct of the jury.

At common law there were no degrees of murder. All murder was punishable by death. However, the Legislature of this State has seen fit to divide murder into murder of the first degree and murder of the second degree. Code, 61-2-1, provides:

> "Murder by poison, lying in wait, imprisonment, starving, or by any wilful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery or burglary, is murder of the first degree. All other murder is murder of the second degree.

> "In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, wilfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased."

There can be no murder without a homicide but the converse is not true. A homicide may be murder of the first degree, of the second degree, or voluntary manslaughter or involuntary manslaughter or it may be justifiable. *State* v. *Galford,* 87 W. Va. 358, 105 S. E. 237. A homicide becomes a criminal offense only if the corpus delicti is established just as in any other offense. In *State* v. *Beale,* 104 W. Va. 617, 141 S. E. 7, this Court said that to constitute the corpus delicti in a case of homicide two fundamental facts must be established: (1) the death; and (2) the existence of criminal agency as the cause thereof. When the State has established by the requisite proof the corpus delicti the presumption is that it is murder of the second degree. If the State would elevate the offense to murder of the first degree, the State must establish the characteristics of that crime and, conversely, if the prisoner would reduce it to manslaughter or justifiable homicide the burden of proof rests upon him. *State* v. *Morrison,* 49 W. Va. 210, 38 S. E. 481; *State* v. *Douglass,* 28 W. Va. 297; *State* v. *Cain,* 20 W. Va. 679.

The deceased, Louise Davis, was the manager of the Atlantic Sea Food Market, located at 1642 8th Avenue in the City of Huntington, Cabell County, West Virginia, a business enterprise which was usually open between the hours of 6:30 p. m. and 2:00 a. m. on Thursday, Friday and Saturday of each week. On Thursday, February 4, 1960, the owner came to the market between 10:00 and 11:00 o'clock p. m., and determined that there was approximately Twenty Dollars ($20.00) in petty cash in the cash register. The market consisted of two rooms lighted by either three or four single light bulbs to each of which a string was appended. The outside was lighted by a light controlled by a switch located over the door on the inside of the building. The owner returned to the building on the morning of February 5, 1960, at approximately 11:00 a. m., found the front door closed, but not locked; the lights out, one "fire" burning in the stove; and, discovered the body of deceased in the rear room.

A pathologist testified: ". . . First of all, the face had some sort, didn't know what it was, it looked like sooty mud and some sort of fine gravel and sand on it. We washed that off and found an excoriation that looked like sand paper or something extremely rough had been sideswiped against the head. The lower jaw was broken on both sides and you could just move it around. The face, I hate to use the word, had been stomped so that you could take the nose and everything up here and move it around and then there was a huge, almost like a sunburst laceration over the left side of the forehead and then there had been multiple, multiple, numerous tearing wounds of the scalp. The bones of the head had been driven internally, into the brain. One large area was so big, 7½ centimeters and numerous other sorts of circular defects around this larger one. There was a lot of hemorrhage into the inside of the skull and around the brain. The clothing, the hands and the face were splattered with blood and some of it was dried. . . Then there was a slit, about a centimeter and one half long through the apron that she wore, through her undergarments into the left lung with a slit in the left pulmonary artery, that is more or less externally, sir. . . There was a panty girdle which had been

pulled off forcefully. The shoes were still on but the stockings had been turned inside out and the stocking which was now on was now turned inside out and covered therefore the right shoe and had been jerked in half, while the left stocking was still intact and attached to the panty girdle. She had a pair of panties on. I have forgotten the color. They were only on the left leg, they had been pulled off the right leg." The doctor further testified that: spermatozoa was found in the vagina of the deceased; any of the classes of injuries, that is, to the skull, the face or the slit in the lung, would have resulted in death; and, she had been dead approximately 12 to 16 hours previous to the time he examined her at 1:00 p. m. on February 5, 1960.

George France, a teacher of physical education and athletic coach at one of the high schools in Huntington, testified for the State and stated that he saw the defendant in the Atlantic Seafood Shop about 12:25 on the morning of February 5th. He also stated that he saw another man in the place at that time. He made this answer to a question: "A. She was facing the window there, standing up to the counter and the individual I could see through the door, had his back turned and Ernest was standing around at the side of the counter leaning on the counter." He further testified that he had known the defendant for about fifteen years and on cross-examination stated that the defendant was in one of his physical education classes and "I wouldn't want a better boy to deal with in class than he was."

William E. Morton, twenty-three years of age, another witness for the State, who testified that he had known the defendant "about all my life", was asked the following questions and made these answers: "Q. I will direct your attention to the early morning of Friday, February 5th, 1960, and I will ask you if you saw Ernest Stevenson at that time? A. I did. Q. Where did you see him? A. In the door. Q. In the door of what? A. The Seafood company. Q. At about what time was that? A. 1:10. Q. About ten minutes after one in the morning? A. Yes, sir. Q. What was the occasion for your seeing him? I mean where had you been or where were you going? A. I had just *came* up from

Fred's Bar-be-que shop and was walking up the South side of the street going East and I looked over my shoulder and *see* him. Q. You say you saw him? Do you mean Ernest Stevenson? A. Yes, sir. Q. Where was he when you saw him? A. In the door between the screen and the door. Q. Was the screen door open or closed? A. The screen door was open. Q. Do you know whether the door was open or closed? A. No it was open. Q. Was he standing in the doorway? A. In the doorway. Q. Was the door open or closed? A. The screen door was open."

Sandra Matthews, a witness for the State, testified that on the 5th day of February she lived at 1331 8th Avenue, was standing with a friend, James Mauck, at the front of her dwelling house and at that time and place saw the defendant. After stating that she had known the defendant for six or seven years, these questions were asked and these answers made: "Q. About what time was it when you first saw him? A. I would say that it was about 1:20. Q. 1:20, was that in the morning? A. It was in the morning. Q. Night time or early morning? A. yes, sir. Q. Where were you at the time you saw him? A. Standing in front of my house. Q. Where was your house at that time? A. 1331, 8th Avenue. Q. Was there anyone with you on that occasion? A. Yes, sir. Q. What was his name? A. James Mauck. Q. Where were you and James standing? A. In front of my house. Q. Where did you see the defendant? A. He was passing the house. Q. Did he speak to you? A. Yes, sir, he spoke. Q. Did you talk with him? A. No, we didn't talk with him. Q. What did you say, just 'hello'? A. I spoke and he kept on going." On cross-examination these questions were asked of this witness and she made these answers: "Q. Which way was he going on 8th Avenue, East or West? A. Well, he was going West, he was coming from 16th Street I guess. Q. Coming from that direction? A. Yes, sir. . . Q. I believe you used to go with Stevenson at one time? A. Yes, sir, in '57. Q. In 1957? A. Yes, sir. Q. How long did you all go together? A. We went together until the middle part of '58, I will say March of 1958."

This is the statement made by the defendant at about
3:10 p. m. on the day of the murder: "I, Ernest Stevenson,
age 22, living at 1002 28th Street, Huntington, W. Va., Cabell
County, wish to give the following statement with the
knowledge that anything I may say can and will be used in
court as evidence against me. I understand that I do not
have to make this statement and I understand that I have
the right to call an attorney and that I give this statement
of my own free will without any threats or promises being
made to me: I went down to the whiskey store on 9th Street
and bought a pint of whiskey. Then I went back to my
sister's house at 1002 28th Street. I stayed there and drank
that pint and then I left there. It was right at midnight be-
cause I am remembering looking at my watch. I walked all
the way down to the fish market on 8th Avenue and I saw
Jack Davis's wife inside sweeping, so I went inside. The
next thing I remember I was walking across the street with
this hammer in my hand. I walked through the housing
project and walked west on Artisan Avenue to Barnett
School and I walked down the alley behind the school and
I think I dropped the hammer there someplace. Then I
must have walked around for awhile then I went to my
sister's house and went to bed. This was about 3 o'clock
in the morning. I had to wake my brother, Walter, to get
in the house. Then about 11:35 this morning I woke up and
went to my jacket to get a cigarette. It was then that I
noticed this blood on my jacket. I tried to remember what
had happened but I couldn't remember. I did remember
coming out of some place and having this hammer in my
hand. I also found all this money in my pocket and I couldn't
remember where it came from. Then that is all I can re-
member until you all come to the house to arrest me. I had
been to the bathroom and washed my face and hands and
had all my clothes on except my jacket when you all came."
The statement continues in the form of questions and an-
swers as follows: "Q. Ernest, were you drunk last night?
A. I was drunk just about all day yesterday. Q. Can you
read and write? A. Sure. Q. Are you sober at this time?
A. Yes. Q. Ernest, we are now going to ask you if you
killed Louise Davis at the Atlantic Sea Food at 1640 8th

Ave.? A. I don't know. Q. Ernest, did you rape Louise Davis? A. I told you I don't remember what I done. Q. Ernest, when you came out of the Sea Food place did you notice whether you had blood on you or not? A. No, it was dark, I couldn't see nothing. Q. Did you wash before you went to bed this morning? A. Yes. Q. Did you notice anything around your shorts or your penis when you washed this morning? A. No. Q. Ernest, when you walked into the Sea Food place did Louise say anything to you? A. I don't know. Q. Do you remember having a brassiere in your hand when you came out of the Sea Food Place? A. I didn't have nothing in my hand but a hammer. Q. Ernest, do you have any idea where you got this hammer you keep speaking about? A. It must have come from inside the place, cause I didn't have one when I was walking down 8th Avenue. Q. Why did you go into the Atlantic Sea Food Shop? A. I remember I got to the door and something said go on in and when I walked in the heat just hit me in the face and I don't remember anything after that. Q. Ernest, do you know Louise Davis? A. I didn't know her personally. I just knew her well enough to speak to her on the street. Q. Have you been in the Atlantic Sea Food Shop many times? A. I never did go in there before last night. Q. Ernest, do you remember Louise scratching you? A. No, I don't. Q. Do you remember being in the back room? A. No. Q. When you went in the Sea Food place, did you see anyone else in there besides Louise? A. I don't know. Q. When you noticed the blood on your jacket this morning, did you have any recollection of where it had come from? A. No. Q. Ernest, are you sure that you dropped the hammer in the alley behind Barnett School? A. *No, I have thought about it and now I remember putting it in a garbage can in the rear of a house on the corner of the alley behind and below Hamilton's Do-Nut Shop.* Q. Ernest, I now show you a hammer and I ask you if this is the hammer that you put in the garbage can? A. It looks like it. Q. Ernest, what time did you buy the pint of whiskey on 9th Street? A. It was between 8:30 & 9:00 P. M. last night. Q. What time did you return to your sister's at 1002 28th Street, after buying this whiskey? A. Around 10:00 P. M. Q.

What time did you leave 1002 28th Street after drinking this whiskey? A. Around midnight." (Italics supplied.) The statement, including the questions and answers, is signed by the defendant, Ernest Stevenson; Witnesses: B. T. Tomlinson and D. E. Salyers; and subscribed and sworn to before a notary public.

The defendant, in his formal statement, described the garbage can in which he had placed the hammer with such accuracy that two police officers found it at 821 13th Street without difficulty. Detective Don L. Salyers, in his testimony on direct examination, stated: ". . . Me and Sgt. Tomlinson left headquarters and went to an address on 13th Street and a lady by the name of Mrs. Powers, at 821, 13th Street lived there and we walked in the back yard and Mrs. Powers was out back, on the back porch. We identified ourselves as police and told her briefly what we were looking for and what had happened and I took a piece of paper from my inside coat pocket after opening the garbage can, taking the lid off, and I could see the hammer and I picked up the hammer with a piece of paper and we come on back into headquarters and completed our statements, etc." The witness was asked these questions and made these answers: "Q. You say that you found this hammer at Mrs. Power's how did you know to look in that vicinity for the hammer? A. Well, the accused finally told us that he had thrown the hammer or placed the hammer in a garbage can in an alley between 8th and 9th Avenue below 13th Street and we finally pin-pointed and came to the conclusion it was the Southwest corner house in the rear of the southwest corner and we knew exactly where to go and find it. Q. Is that where you went and found it? A. Yes, sir. . . . Q. Now, Mr. Salyers, I will ask you if at that time when you found that hammer, did it contain on it any place any foreign substance? A. Yes, sir, it contained what appeared to me to be blood stains and as I recall it had hair or what appeared to be hair on it at the time."

An expert witness for the State, qualified as such, testified that he had examined the blood on the defendant's wrist watch, both shoes, pants, jacket, handkerchief, shorts and

the hammer that was alleged to have been the weapon used to commit the homicide and had ascertained that all had human blood upon them. The handkerchief had been found in the pocket of defendant's jacket, containing silver money which, with a few bills found in other pockets, amounted to $22.21. The hammer in question was identified by the owner of the establishment and by an employee thereof as being the same hammer that was under the counter of the Atlantic Sea Food Company, but which had disappeared some time between February 4 and eleven o'clock on the 5th of February.

As heretofore stated the body of the deceased was discovered about 11:00 a. m. on the morning of February 5th, the officers made inquiry in the vicinity and upon the basis of what they learned the defendant was arrested approximately thirty minutes later. The testimony of the three officers and the defendant as to what transpired when the car in which those four persons were riding stopped about fifty feet from the scene of the alleged crime will be stated in more detail under the assignment of error with regard to the admissibility of the alleged oral confession of the defendant made at that time. There was no objection to the written statement of the defendant which has heretofore been quoted verbatim.

This is the first syllabus point of State v. Bowles, 117 W. Va. 217, 185 S. E. 205: "In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the accused beyond a reasonable doubt, though the evidence adduced by the accused is in conflict therewith. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done." That syllabus point has been quoted with approval by this Court in the recent cases of State v. Milam, 142 W. Va. 98, 94 S. E. 2d 442, and State v. Spradley, 140 W. Va. 314, 84 S. E. 2d 156. In the opinion in the Spradley case there are twelve decisions of this Court cited in support of it. It is the opinion

of this Court that the jury was justified in finding from this evidence beyond a reasonable doubt that the defendant was guilty of murder of the first degree.

The Court is also of the opinion that the alleged misconduct of the jury was not prejudicial to the defendant in the instant case. It appears by affidavit of the auditor of the Hotel Frederick, in which the jury was housed on the nights of September 20, 21 and 22, during the trial of the case, that the members of the jury were assigned rooms on four different floors of that hotel and that, during the time they were there: thirteen outgoing telephone calls were made from rooms occupied by seven of the jurors; television sets were in three of the rooms assigned to jurors; and, there was a radio set in every room. At the hearing in the Common Pleas Court, pursuant to the remand for that purpose by the Circuit Court of Cabell County, it was developed that: the jury was in custody of two deputy sheriffs each night; upon leaving the courtroom, and returning to the hotel, some jurors walked upstairs to their rooms, others took the elevator, in two groups, each group escorted by a deputy; the jury met in the lobby for meals; the deputies, each assigned to a room on a different floor would check to see that the jurors were in their rooms between 10:30 and 11:00 p.m. and would then retire for the night; the jury was cautioned by a deputy not to use the telephone or to watch or listen to any newscasts; and five of the jurors assembled in the room of another to play "penny ante", walking to and from their own rooms on the other floors unescorted. The jurors testified as to all of the telephone calls but one, stating that they had called their wives on various matters but did not discuss the case, as to all of which calls and the subjects thereof they were corroborated by their respective wives. One juror called a nearby drugstore for some necessary medicine which was delivered to his room. The one unexplained telephone call was made to the office of Eastern Airlines and it was admitted by the Hotel Auditor "that Gladstone 31311 could quite possible— or is somebody else's call, having been made from the same room previously occupied by another person." All jurors denied any discussion of the case whatever; denied seeing

or listening to any newscasts; denied any misconduct; and testified that they considered themselves to be in the custody of the deputies at all times.

It is pertinent to consider the Acts of the Legislature with reference to the responsibility of the trial court and the sheriff with regard to the assignment of error as to the alleged misconduct of the jury during the trial of the defendant. Prior to 1955 it was the law of this State that in all felony cases after a jury was empaneled and sworn they should be "kept together" until they agreed upon a verdict or were discharged by the court. However, the applicable section, Code, 62-3-6, was amended by the Legislature at the Regular Session of 1955 to provide in part as follows: "After a jury in a case of felony punishable by death is empaneled and sworn, they shall be kept together until they agree upon the verdict or are discharged by the court. In the case of felony in which the punishment cannot be death, the jury shall not be kept together unless the court, in its discretion, order it to be so kept together. . . ." Perhaps it is of significance to note that the people of this state at the general election of 1956 approved this proposed amendment to the Constitution of this State: "Regardless of sex, all persons, who are otherwise qualified, shall be eligible to serve as petit jurors, in both civil and criminal cases, as grand jurors and as coronor's jurors." The Legislature, at its Regular Session of 1957 further amended the provisions of Code, 62-3-6, to provide that ". . . After a jury has been empaneled no sheriff or other officer shall converse with, or permit anyone else to converse with, a juror unless by leave of the court. The court shall, in its discretion, determine the manner in which the jury shall be *kept in custody* by the sheriff or other officer or officers until the jury agree upon a verdict or are discharged by the court." (Italics supplied.) This case was tried after the 1957 amendment. This is the first case in which this Court has passed upon the question of the improper conduct of a jury subsequent to that amendment. It is apparent that after the Constitutional amendment making women eligible for jury duty and the 1957 legislative amendment it was not contemplated that the jury be kept together by providing sleeping quarters for the

jurors and the officer in charge of them in one large room. However, that does not mean that the former decisions of this Court as to what constitutes an improper separation or other misconduct of a jury are abrogated.

In the somewhat similar case of *State* v. *Clark*, 51 W. Va. 457, 41 S. E. 204, there was a separation of the jury and in that case six of the jurors were housed on one floor of a hotel and six on another floor. During the trial there were times when one or more of the jurors became separated from the others. But this Court in holding that there was no prejudice to the defendant said: "The judge of the court below having seen and heard all of these witnesses testify, had a far better opportunity to ascertain what the facts were and whether they were such as to prejudice the prisoner than this Court has and his finding in reference to that matter is entitled to great weight. Aside from that, nothing has been shown in all this testimony which is deemed to have been prejudicial." In this case the trial court has found no prejudicial error and in that regard he is sustained by the intermediate appellate court, the Judge of the Circuit Court of Cabell County. This Court will not upon that assignment of error reverse such finding.

The assignment of error that has caused immediate concern to this Court is the question of whether the trial court committed reversible error in admitting the testimony of the police officers as to the alleged oral confession of the defendant. At the time of the alleged oral confession defendant was in a police cruiser of the City of Huntington with three police officers of that city. The first officer introduced by the state as a witness was Joe Coleman, who stated that he was a police sergeant, had been a member of the department for nineteen years and had known the defendant for "several years". After the witness testified to the arrest of the defendant, this question was asked: "Q. All right, now did you go any place and take this defendant with you? A. We placed him in the patrol car and started down 8th Avenue and on the way down we decided to stop at the scene of the crime and take him in to view the remains at the Atlantic Sea Food Store and Detective Salyers stopped

the car in about fifty feet of the place and we proceeded and started to take the defendant inside and he said what are you taking me in there for and Detective Tomlinson said don't you want to go in there and he said I don't want those people to look at me and Detective Tomlinson said why don't you want to go in there, why don't you want to go inside and he said I don't want to go and Detective Tomlinson asked him if he wanted to tell us about it and he said I will tell you what you want to know when we get to headquarters and Sergeant Tomlinson said no, you tell us now, did you do it, and he said, yes I did." These further questions were asked of this witness and he made these answers: "Q. All right, what if anything did you then do? A. Took him to the police station to the Detective Bureau. Q. Now, did you have anything further to do with this case Sergeant. A. No, sir, other than the money was counted there. Q. That was all silver that you had taken from him? A. Yes, sir. Q. Were you there when it was counted? A. Yes, sir. Q. Do you recall how much there was? A. Counted the silver and the bills and there was Twenty-two Dollars and a few cents. Q. You found that wrapped in a handkerchief I believe you said in Stevenson's jacket pocket? A. The silver was and I believe several bills were taken from another pocket. Q. All right, then did your connection with the case stop at that time? A. Yes, sir, it did." There was no objection by counsel for the defendant to any question asked this witness. Counsel for the defendant then proceeded to cross-examine the witness and the cross-examination continued until the time came for adjournment of the court for that day.

On the next day the record shows that immediately after the formal opening of the court the following colloquy took place: "By Mr. Baker: Your Honor, at this time I want to make a motion. By the Court: All right. By Mr. Baker: At this time I would like to move that the evidence of the witness Joe Coleman in as far as it pertains to a statement that the accused made to him pertaining to his guilt of this charge be excluded from the evidence as that is in effect a confession and it does not comply with the rules covering the introduction of a confession in that he was not warned

that any statement he made may and would be used against him or any of the other requirements on entering of a confession and for that reason I now move that the court strike that evidence from the record. By the Court: Overruled. By Mr. Baker: Exception." It should be observed that neither at that time nor at any time during the trial did counsel for the defendant request the trial judge to hear testimony upon and determine, out of the presence of the jury, the issue of whether the alleged confession was voluntary or otherwise. The testimony of the two other officers who were present when the alleged oral confession was made was substantially the same as this witness.

Upon direct examination the defendant was asked these questions and made the following answers thereto: "Q. Now you heard the testimony here of a police officer, Ernest, concerning a statement that you made when they had you in their custody in front of the Fish Market? A. Yes. Q. Can you tell us what conversation took place on that occasion? A. After we left the house, after they put me in the car and left the house, they didn't park in front of the fish market, they parked up the street and said come on, we are going to take you inside and I said what for and they said we got something we want to show you and I said I don't want to see and he said how do you know and I said I don't know what you want me to see and he said we will show you, come on with me, I am going to show you and I said, no, I am not going in there and he said are you going to tell us what happened, and I said tell what, nothing happened and he said, well come on, I am going to take you inside and he said you are going to tell me and I said tell you what, tell you about what and he said the murder and I said I don't know anything about a murder and he said I am going to take you in and I said I don't want to go in there with all those people standing in there like that and he said are you going to tell us about it and I said I will tell you what you want to know when we get down to the police station and he said no, tell me now and I said I will tell you what you want to know and one of them went inside and came back out and two were still in the car with me and they said something to me and I said I will tell you what

you want to know when we get down there so the other one said he is going to tell us and they brought me down to the police station. Q. Did you at any time say that you had murdered Louise Davis? A. Never did."

As heretofore stated there was no objection to the testimony of Police Officer Coleman to the effect that the defendant admitted in the presence of the witnesses, Sergeant Tomlinson and Detective Salyers, that he had killed the deceased. Counsel for the defendant completed his cross-examination of the witness prior to the adjournment of court for that day, and the motion made by counsel for defendant on the following morning to exclude that part of Coleman's statement relating to the oral confession has heretofore been quoted verbatim. After the motion of counsel for the defendant to strike the evidence of the witness Coleman pertaining to the alleged oral confession of the defendant was overruled, Detective Salyers was the next witness for the state. When Salyers reached the point in his testimony where he related the statement of the defendant that he had killed the deceased, counsel for the defendant interposed an objection which was overruled by the Court and the witness continued his testimony with regard to what transpired thereafter. The same procedure was followed when Detective Tomlinson testified to the statement of the defendant to the same effect. It is apparent from this record that counsel for the defendant were not surprised by the testimony of the witness Coleman as to the alleged oral confession made to him and other police officers. In his opening statement to the jury Mr. Russell Daugherty, the prosecuting attorney, stated: ". . . We will show you by the testimony of three police officers that when this man was taken to the scene of the crime he admitted to them that he had committed the murder and we will introduce to you at the proper time a statement taken by the police officers from this defendant in which you will see when the state has introduced the writing and you will see that he recites everything he did from the time he went into the store until the time he left with the exception for one brief lapse of memory or blackout which was of course was the time when the actual murder was committed. . . ."

The precise question thus presented is apparently one of first impression in this State although there is much authority elsewhere. In 102 ALR at page 605 there is an annotation dealing with the duty of a court to institute a preliminary investigation as to the voluntary or involuntary character of a confession. Beginning on page 633 is this statement: "The proper time for objection to an alleged confession is when testimony regarding the confession is offered in evidence, and the court need not grant a preliminary hearing on objection made at an earlier date. Of course, in order for the defendant's request to be properly designated one for a preliminary examination, it must be made before the alleged confession is introduced in evidence, and a subsequent request for a so-called preliminary examination has been held ineffective." In *People* v. *Farmer*, 194 N. Y. 251, 87 N. E. 457, the Court affirmed the judgment of conviction and upon the issue here presented stated: "The defendant also insists that the court erred in denying her the right to a preliminary examination of one of the witnesses before he testified to certain confessions alleged to have been made by her. The request to be allowed such preliminary examination was made after the sheriff had been fully and at length examined and cross-examined with reference to the confessions of the defendant, and it was not until the witness, giving his testimony at the time of the request, had been fully examined as to everything relating to the defendant's confessions except as to statements made by her at the jail. . . . In this case it appeared at the time when the request was made for a preliminary examination that it was not in fact preliminary to the confessions, but that the defendant's confessions had been already heard by the jury, . . ."

In *Davis* v. *State*, 182 Ark. 123, 30 S. W. 2d 830, the Court held that it was incumbent upon the accused to request the Court, as a preliminary matter, to hear testimony as to whether a confession was voluntary or otherwise and that in the absence of such request it was not error for the trial court to permit the hearing of such evidence without a preliminary hearing in the absence of the jury. In *State* v. *Davis*, 34 La. Ann. 351, the Court held that "In the absence

of timely objections from the accused, the court will not exclude evidence of an alleged confession, because preliminary proof was not offered, on the part of the state, to show that the confession was made freely and voluntarily. . . ." The Court stated that a different rule would have a tendency to induce the accused to take his chances of an acquittal upon the evidence introduced without objection, and in case of conviction to obtain a new trial on the ground of erroneous rulings by the trial court on points not raised at the trial. In *State* v. *Blodgett,* 50 Or. 329, 92 P. 820, it was held that the trial court did not commit error in overruling the defendant's motion to strike out testimony of a confession after it had been admitted without objection, and where no evidence of duress in obtaining the confession was shown. In the opinion, the Court said: "If defendant should have any reason to claim that the alleged confession was involuntary, he should present his objection when the offer is made, and, before the conclusion of the preliminary hearing, offer such testimony, if he has any, to support his objection and to rebut that offered by the state, or, upon his failure to do so, be precluded from thereafter objecting." In *State* v. *Maupin,* 196 Iowa 904, 192 N. W. 828, 195 N. W. 517, the defendant was convicted of murder and the state had presented in evidence written confessions of the defendant without defendant's counsel having the opportunity to examine the witnesses present at the time the confessions were made and the court, in affirming the judgment of the lower court, said: "The record does not disclose that defendant's counsel requested the privilege of first examining the witnesses with a view to ascertaining the circumstances under which the confessions were made. The record shows, without question, that the confession was made eligible for the record before it was received. Also, counsel for defendant cross-examined the witnesses exhaustively."

In *Eberhart* v. *State,* 47 Ga. 598, it was held that the trial court did not err in allowing confessions of the defendant to go to the jury without a preliminary examination and without proof that they were voluntarily made when during the trial no objection was made and the attention of the court was not called to the matter. The Court said: "We

incline to think that, if objected to, it would have been the duty of the state to show the circumstances under which they were made, that the court might see if they were voluntary. But confessions are not illegal evidence, standing alone. . . . It is the right of the prisoner to object to their coming in, unless the circumstances under which they were made also come in; but if he or his counsel fail to object, and the confessions go to the jury without any special inquiry as to the circumstances, he is not entitled to a new trial."

Counsel for the defendant rely upon the decisions of this Court in *State* v. *Zaccario,* 100 W. Va. 36, 129 S. E. 763; *State* v. *Brady,* 104 W. Va. 523, 140 S. E. 546; and *State* v. *Mayle,* 108 W. Va. 681, 152 S. E. 633. The single syllabus point in the *Zaccario* case is: "To render admissible evidence of an extra-judicial confession by an accused to one in authority, or some person acting under the apparent sanction of those in authority, it must appear that the confession was freely and voluntarily made and without previous inducements of a temporal or worldly character or in the nature of threats or intimidation, or some promise or benefit held out to the accused by which he may expect mitigation of punishment or to escape from the consequence of his crime." It is stated in the opinion that the prosecution, over the objection of the defendant, introduced evidence of an alleged confession by the defendant shortly after his arrest to the jailor and arresting officer, without showing that it had been freely and voluntarily made. It was further stated in the opinion that the state should have shown by affirmative testimony as a condition precedent to the admission in evidence of the confession that it was not made under inducement of fear or favor. However, this sentence appears in the opinion: "The defendant denied the confession and stated, *without contradiction,* he was assaulted by the jailor for refusing to make any incriminating statement." (Italics supplied.)

In the *Brady* case the evidence as to the admissibility of the alleged confession was heard by the Court in the absence of the jury previous to its introduction into evidence and

the Prosecuting Attorney of Mineral County, the Prosecuting Attorney of Hardy County, a deputy sheriff of Hardy County and one James Welton testified that the confession was voluntarily made and "that no inducements were held out to him, no threats made to him, or offer of benefit of any character or in mitigation of punishment; that in fact it was freely and voluntarily made." This Court, in refusing to disturb the lower court's ruling that it was admissible, stated: "The real question in every case as to whether or not a confession is admissible is whether or not the confessing mind was influenced in any way to create a doubt as to the truth of the confession; and over this doubt or question the trial court has a wide discretion, and this discretion will not ordinarily be disturbed on review." The judgment of the Circuit Court of Hardy County sentencing Brady to death for rape was affirmed.

In the *Mayle* case an alleged confession of the defendant was admitted in evidence although in the opinion the Court said: "It is true that the prisoner has stated that he would not have made this confession if he had not been induced to do so by threats and acts of violence on the part of the officers. The officers all unite in denying the use of any threats or violence. Both court and jury have determined this fact contrary to the prisoner's contention." The officers denied that any force was used to secure the confession but a member of the Department of Public Safety admitted that he did tell the defendant that "it was best to tell the truth". In commenting upon that question the Court made these pertinent statements: "Did this render the confession inadmissible? There are authorities which in a measure so hold because of the presumption that, under all the circumstances of the particular case, the party in making them was influenced by the admonition made. However, there is a great line of cases holding to the contrary. The latter proceed on the theory that where the prisoner is advised to tell the truth, it cannot be supposed that he would be induced thereby to confess to a crime of which he is really innocent. The real question being whether there has been any threat or promise of such nature that the prisoner would likely tell an untruth for fear of the threat, or hope of profit

from the promise. *State* v. *Goldizen,* 93 W. Va. 328, 116 S. E. 687. So, if what is said to the prisoner has no tendency to induce him to make an untrue statement, his confession is admissible. 3 Russ. on Cr. (5th Ed.) 442. But as we have shown, each case must be viewed in its own setting to determine the question. For this reason it would serve no useful purpose to attempt to review or reconcile the cases, pro and con, if it were possible."

In *State* v. *Goldizen,* 93 W. Va. 328, 116 S. E. 687, this Court held that a confession made to a prosecuting attorney, police officer or other person in authority was admissible in evidence against him if voluntarily made. *State* v. *Morgan,* 35 W. Va. 260, 13 S. E. 385, and several Virginia cases are cited for this statement in the *Goldizen* opinion: "It is well settled by the decisions of this state and those of Virginia that a confession may not be given in evidence if it appears that it was obtained from the accused by some inducement of a temporal or worldly character in the nature of a threat, or some promise or benefit held out to the accused by which he may expect to escape from the consequence of his crime, or mitigation of punishment, by some one in authority or by some person with the apparent sanction of those in authority." This is the single syllabus point of the case: "A confession of the accused is admissible in evidence where *is* appears that it was made to the prosecuting attorney and sheriff without any inducement of a worldly or temporal character in the nature of a threat, promise or benefit held out to him by them in respect to his escape from, or mitigation of, his punishment. Information from them to him that a confederate in the crime had confessed and placed the guilt on the accused, unaccompanied by any threat, inducement or promise of benefit by which he could escape from, or receive diminution of, punishment from the consequences of the crime will not render the confession inadmissible." Judge Lively, who wrote the opinion for the Court, made this interesting observation: "The reason for excluding confessions fails in the case at bar. Greenleaf lays down the proper test as follows: 'The only proper question is, whether the inducement held out to the prisoner was calculated to make his confession an untrue

one.' He further says that the spirit of extreme caution and liberality toward accused persons has resulted in many rulings not to be defended upon principle; but the tendency in law courts today is towards repudiating the most extreme of these rulings of the first half of the nineteenth century, and to approximate toward the use of the test above quoted. Greenleaf on Evidence, Vol. 1, sec. 219. In *Baldry's Case*, 2 Denison's C. C. 430, Justice Erle says: 'According to my judgment, in many cases where confessions have been excluded, justice and common sense have been sacrificed, not to the shrine of mercy, but to the shrine of guilt.' " In the *Morgan* case this Court held that a confession made to a private detective with no authority to make promises of help or immunity, was properly admitted in evidence.

In *State* v. *Richards*, 101 W. Va. 136, 132 S. E. 375, Richards and two other defendants were convicted of murder of the first degree and sentenced to imprisonment in the penitentiary for the period of their natural lives. In that case the Court held in the fifth point of the syllabus that a confession made to a public officer would not render it inadmissible if freely and voluntarily made without any threats or intimidations or promises of reward or immunity from punishment for the crime. It was again held in that case that: ". . . it devolves upon the court in the first instance to determine whether the confession of the accused was freely and voluntarily made, or was under duress and threats, or by inducement made or held out by some one in authority, of benefit or reward of a worldly or temporal character respecting his escape from, or in mitigation of, his punishment." The Court held that the burden of showing the qualifying facts respecting a confession of guilt is upon the state, but where the trial court has determined from the evidence that the confession is admissible, "the appellate court will not disturb the judgment when supported by the evidence, though there be conflict therein; for in the end the question of the weight and sufficiency of the evidence to sustain the truth and verity of the alleged confession passes to the jury, who become thereby the final triers of the facts, and of the weight they will attach to such confession." It was further stated in the *Richards* opinion:

". . . The rule as stated in 16 C. J., p. 720, § 1474, is that: 'A confession is not rendered inadmissible by the mere fact that it was elicited by questions put by public officers or others, even though the questions assumed the prisoner's guilt, and although they were roughly asked; but the fact of interrogation may be taken into consideration in determining whether or not the confession was voluntarily made, and sometimes it, in connection with other circumstances, is sufficient to exclude a confession as having been made involuntarily,'. . . ."

There are many other cases, in this jurisdiction and elsewhere, dealing with admissibility or inadmissibility of confessions but, as was stated in the *Mayle* case, ". . . each case must be viewed in its own setting to determine the question. . ." and none of the cases heretofore cited reach the precise point involved herein. In the instant case the defendant categorically denied making any confession whatsoever. It is true that in the *Brady* case, the defendant denied having made any statement whatever, but the trial court had, on a preliminary examination in the absence of the jury, held the purported confession to be voluntary and admissible. This Court, without further comment with regard thereto, noted: "The inconsistency of these two positions of the prisoner regarding the confession is apparent." No other case is found in West Virginia touching this point and little authority is available elsewhere. However, in *People* v. *Hegovic*, 348 Ill. 58, 180 N. E. 561, the Court stated: "The claim of the plaintiff in error was, not that he was beaten and forced to make an involuntary confession but that he made no confession. It is claimed that, although the defendant testified that he had made no confession, the court erred in receiving evidence showing the confession after the plaintiff in error had testified on the hearing, apart from the jury, that he had been beaten by police officers, without hearing the police officers whom he charged with the offense of beating him. On the question whether or not the defendant made any confession, the fact that he was beaten has no direct bearing and evidence of such fact is not admissible on that question. . . ." The Court thereafter held that where the defendant denies having made any con-

fession, the prosecution in such case is required to prove only that a confession was in fact made and there is no necessity for a preliminary hearing as to its voluntary character. In *People* v. *Rose*, 22 Ill. 2d 185, 174 N. E. 2d 674 (1961), the second syllabus point is as follows: "Where defendant, in a prosecution for illegally selling narcotics, specifically denied making oral admissions to arresting officers at the time of her arrest, it is not error for the trial court to admit testimony by the arresting officers that defendant had made oral admissions to them, as her outright denial that any admissions were made merely presented the jury with a simple question of fact as to whether any admissions had in fact been made." In the opinion the Court stated: ". . . Where a defendant denies making any statement, a simple question of fact is presented as to whether the statement was made and the trial court is not required to determine whether it was voluntarily made." Of similar import is the case of *Robinson* v. *State,* 138 Md. 137, 113 A. 641.

The defendant was entitled to have the jury instructed with regard to his theory of the case and the Court gave every instruction offered by him upon the question of whether he made the confession to police officers as they testified, or did not make it as he stated from the witness stand. It is true that no instruction was offered upon that specific question but the Court did give defendant's Instructions Nos. 7, 8 and 16, which are respectively set forth below:

> "The Court instructs the jury that if they find there is a conflict in the evidence in this case on any fact or circumstance tending to establish the guilt or innocence of the defendant, a part of which is in favor of the theory of the State and a part is in favor of the theory of the defendant, and the jury should entertain a reasonable doubt as to which is true, then it is the duty of the jury in arriving at their verdict to adopt the evidence, theory and conclusion most favorable to the accused."

> "The Court instructs the jury that in arriving at a verdict in this case they are the sole and exclusive judges of the evidence and the credibility of each and every witness introduced in this case;

that the jury has the right to disregard the testimony of any witness, or witnesses, who in the opinion of the jury have testified falsely in this case, or to give to the testimony of any witness, such weight as in the opinion of the jury the same may be entitled to under all the circumstances of this case, and in ascertaining such weight the jury may take into consideration the character, motive, or anything else surrounding the witness, or his testimony, as disclosed by the evidence and circumstances in the case; that in passing upon the credibility of witnesses they may take into consideration the reasonableness or unreasonableness of their statements, their apparent bias or prejudice, as well as their interest in the outcome of the case, if any, as well also as their intelligence or lack of intelligence and their demeanor while upon the witness stand and from these and other facts and circumstances appearing in the case, the Jury may give the evidence of any witness or witnesses only such credit as the jury may think such testimony entitled to, because the Jury is the sole judge of the evidence, as well as the credibility of the witnesses who testify in the case."

"The Court instructs the jury that the defendant, Ernest Stevenson, had the right to testify in his own behalf, and the jury have no right arbitrarily to disregard or disbelieve his evidence in whole or in part merely because he is on trial charged with crime, but it is the duty of the jury to weigh and consider his evidence the same as that of any other witness, and give to his evidence such weight and credit as they think the same is entitled to, and to weigh his evidence under the same rules as they weigh the evidence of other witnesses testifying in this case."

It is the opinion of this Court that when Officer Coleman was permitted to testify without objection to the oral confession of the defendant, counsel for the defendant proceeded to cross-examine him without objection or request for a preliminary hearing upon the admissibility of the oral confession and, at no time during the trial asked the trial court to hold a preliminary hearing in the absence of the jury to determine the admissibility of the confession, that the trial court committed no error in refusing the motion

to strike the testimony of Coleman with regard thereto or in overruling the objection to similar testimony by Salyers and Tomlinson, inasmuch as it is clear from the testimony of these three witnesses that the alleged confession was not made under duress or threats or by any inducement made or held out to the accused by either of the officers present of any benefit or reward of a worldly or temporal character, or in mitigation of punishment. The testimony of the defendant as to what transpired at the place where he was alleged by the police officers to have made the oral confession is free from any contention to the effect that these officers attempted to secure a confession from him by any "inducement of a temporal or worldly character in the nature of threats or intimidation, or some promise of benefits held out" to him by which he could have expected mitigation of punishment or to escape from the consequences of his alleged crime. Police officers investigating a crime, especially one as serious as the murder of Louise Davis, were within their rights in requesting the defendant to go with them to the scene of the crime if they did not use or attempt to use any physical force upon him or make any threats to do so. Assuming that the officers did request the defendant to leave the police cruiser and go into the fish market, that is not the type of threat or inducement that is sufficient to render his alleged confession involuntary. Furthermore, as heretofore stated, the defendant denied making any confession to the officers. If this or any other court should adopt an invariable rule that it is reversible error to admit in evidence a confession, oral or written, of a defendant even though his counsel did not object thereto, and especially where the defendant later in his testimony, denied having made such statement, it would be difficult if not impossible for a trial court to prevent the injection of reversible error into practically every criminal case in which the state sought to introduce such testimony.

This Court finds no error in the order of the Circuit Court of Cabell County in affirming upon writ of error and supersedeas the judgment of the Common Pleas Court of Cabell County and therefore that order is affirmed.

Judge Given participated in the decision of this case, indicating he would dissent from the holding herein, but died previous to the preparation and pronouncement of this opinion.

*Affirmed.*

HAYMOND, JUDGE, dissenting:

As the record indicates clearly that the defendant Ernest Stevenson, an indigent Negro youth twenty two years of age, who was represented by court appointed attorneys, did not have a fair trial and that his conviction upon the evidence by the jury that heard and evaluated it does not satisfy the requirements of due process, I can not concur in the decision of the majority of this Court which by a three to two vote affirms the judgment of the Circuit Court and the judgment of the Common Pleas Court of Cabell County which upholds his conviction of murder of the first degree and sentences him to death by electrocution.

It is my considered opinion that the judgment of the common pleas court is prejudicially erroneous in at least three particulars and for that reason I register this dissent.

Except the admissions in the written statement and the testimony of the defendant and in his oral confession to the three arresting officers while in their custody, the evidence upon which the prosecution relies for conviction is entirely circumstantial and in my judgment is not sufficient to support the verdict of murder of the first degree without recommendation. No one saw the defendant kill the deceased, or rape or attempt to rape her, or rob or attempt to rob her. The disheveled or disarranged condition of the clothes and undergarments of the deceased and the presence of spermatozoa in her vagina are not sufficient circumstantial evidence to establish rape or an attempt to commit rape when considered with the testimony of the husband of the deceased, who stated that they had been married for about twenty five years and lived together until the day of her death and the testimony of the doctor who examined the body and performed an autopsy during the afternoon of the day the body was discovered, who stated that such cells would be

present in a living or deceased female for a period of forty eight to seventy two hours after the occurrence of sexual intercourse.

The presence of twenty two dollars and several cents in the possession of the defendant when arrested likewise is not sufficient to show that he robbed or attempted to rob the deceased when considered together with other evidence relating to the money taken from the market in which the homicide was committed. The uncontradicted evidence of the owner of the market was that there were forty two dollars in the cash register at the conclusion of business on the night of the crime. Of the sum of approximately twenty two dollars, two or three dollars belonged to the defendant and the most that he took or could have taken of the forty two dollars would have been about twenty dollars. As he had no opportunity to spend the money which he had or took or to use it to purchase anything between midnight and the time of his arrest about eleven thirty o'clock that morning, it is clear that some person other than the defendant took the remainder of the forty two dollars. If the defendant had taken more than the approximate amount of twenty dollars he would have had it when arrested or if he had spent or otherwise disposed of it the manner of its disposition could readily have been discovered. The defendant testified that he did not know how he got the money; and when, how or from whom he took it was not determined or attempted to be determined and is sheer speculation. He could have obtained it with her consent or taken it either before or after the homicide by some means which were independent of or not connected with the killing.

Similar comments may be directed to the evidence relating to the commission of the homicide. Though one witness saw the defendant and the deceased standing at or near the counter in the front room of the market about twelve twenty five o'clock in the morning of the day the homicide was committed and though another witness saw the defendant standing in the doorway of the market between the closed front door and the open outer screen door about one ten o'clock the same morning, the witness who saw the de-

fendant in the market also saw another person near the counter in the market whom he did not know and could not identify. The doctor who performed the autopsy on the body of the deceased testified that he discovered, in addition to the mashed and battered condition of the head and face of the deceased, an incision wound in the chest apparently caused by a knife which could have caused death. He stated that the deceased had a stab wound in her chest which "would kill her". The defendant did not have a knife and no knife was found among his possessions. The door of the market was not locked when the owner came there about eleven o'clock the same morning. The market had been entered by breaking the rear door by some unknown persons other than the defendant about two or three months before the commission of the homicide. All the foregoing facts are established by undisputed evidence.

The presence of another unidentified person in the market a short time before the homicide, the failure to account for the missing portion of the forty two dollars not possessed by the defendant, the existence of the knife inflicted stab wound, and the absence of any knife on the person or among the possessions of the defendant indicate clearly that some unidentified person other than the defendant could have taken the missing unaccounted for portion of the forty two dollars and killed the deceased with a knife and the hammer before the defendant entered the rear room of the market and left it with the hammer in his possession. These undisputed facts show that there was ample opportunity for some other person to have committed the crime with which the defendant is charged and of which he has been convicted by evidence which to the extent that it may be considered to be competent is in the main circumstantial in character.

This Court has held in an unbroken line of many cases since *State* v. *Flanagan*, 26 W. Va. 116, that when the evidence relied on to convict a person of crime is in whole or in part circumstantial, the accused is entitled to an acquittal unless the guilt is proved to the actual exclusion of every reasonable hypothesis of innocence; that the circumstances from which the conclusion of guilt may be drawn must be

established by full proof and must be consistent with the hypothesis of guilt; that such evidence must to a moral certainty exclude every reasonable hypothesis but that of guilt; and that circumstantial evidence should always be scanned with caution. See *State* v. *Bail,* 140 W. Va. 680, 88 S. E. 2d 634; *State* v. *Allen,* 139 W. Va. 818, 82 S. E. 2d 423; *State* v. *Burford,* 136 W. Va. 472, 67 S. E. 2d 855; *State* v. *Clay,* 135 W. Va. 618, 64 S. E. 2d 117; *State* v. *Cutlip,* 131 W. Va. 141, 46 S. E. 2d 454; *State* v. *Aliff,* 122 W. Va. 16, 7 S. E. 2d 27; *State* v. *Mounts,* 120 W. Va. 661, 200 S. E. 53; *State* v. *Stutler,* 115 W. Va. 393, 176 S. E. 426; *State* v. *Wolfe,* 113 W. Va. 459, 168 S. E. 656; *State* v. *Kapp,* 109 W. Va. 487, 155 S. E. 537; *State* v. *McKenzie,* 108 W. Va. 208, 150 S. E. 602; *State* v. *Snider,* 106 W. Va. 309, 145 S. E. 607; *State* v. *Whitehead,* 104 W. Va. 545, 140 S. E. 531; *State* v. *Hunter,* 103 W. Va. 377, 137 S. E. 534; *State* v. *Mininni,* 101 W. Va. 611, 133 S. E. 320; *State* v. *Harrison,* 98 W. Va. 227, 127 S. E. 55; *State* v. *Beall,* 98 W. Va. 189, 126 S. E. 569; *State* v. *Dudley,* 96 W. Va. 481, 123 S. E. 241; *State* v. *Bennett,* 93 W. Va. 548, 117 S. E. 371; *State* v. *McHenry,* 93 W. Va. 396, 117 S. E. 143. In *State* v. *Flanagan,* 26 W. Va. 116, and in *State* v. *Bennett,* 93 W. Va. 548, 117 S. E. 371, citing 1 Starkie on Evidence, 507-513, and 3 Greenleaf on Evidence, Section 29, this Court, as guides to the safe administration of justice in criminal cases, in which the guilt of the accused is ascertained and determined upon circumstantial evidence, stated and approved these rules, to which it has consistently adhered:

"First. It is essential that all the circumstances from which the conclusion is to be drawn shall be established by full proof, and the party upon whom the burden of proof rests, is bound to prove every single circumstance which is essential to the conclusion, in the same manner and to the same extent as if the whole issue had rested upon the proof of each individual and essential circumstance.

"Second. All the facts and circumstances when established by full proof must be consistent with the hypothesis of the guilt of the accused.

"Third. It is essential that the circumstances should be of a conclusive nature and tendency. Evidence is always

indefinite and inconclusive when it raises no more than a limited probability in favor of the fact, as compared with some definite probability against it, whether the precise proposition can, or can not be ascertained. It is, on the other hand, of a conclusive nature and tendency, when the probability in favor of the hypothesis exceeds all limits of an arithmetical or moral nature. Such evidence is always insufficient where assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true; for it is the actual exclusion of every other hypothesis, which invests mere circumstances with the force of proof. Whenever therefore the evidence leaves it indifferent which of several hypothesis is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence can not amount to proof, however great the probability may be.

"Fourth. It is essential that the circumstances should to a moral certainty actually exclude every hypothesis but the one proposed to be proved."

It is my firm conviction that the circumstantial evidence relied on in this case does not meet or satisfy the requirements specified in the foregoing rules and that such evidence is wholly insufficient to sustain the conviction of the defendant which is primarily based on such evidence, for it does not actually and to a moral certainty exclude every other reasonable hypothesis of innocence. State v. Clay, 135 W. Va. 618, 64 S. E. 2d 117; State v. Hunter, 103 W. Va. 377, 137 S. E. 534; State v. Mininni, 101 W. Va. 611, 133 S. E. 320; State v. Beall, 98 W. Va. 189, 126 S. E. 569; State v. Gilfillen, 96 W. Va. 660, 123 S. E. 578; State v. Dudley, 96 W. Va. 481, 123 S. E. 241.

It is true that the presence of the defendant in the market, his possession of a portion of the stolen money, his possession and disposition of the hammer, and the existence of blood stains on his shoes and clothing create strong suspicion, in the circumstances, of the guilt of the defendant, but they are not sufficient to establish his guilt beyond a reasonable doubt when considered alone or in connection with the other facts shown by the evidence. But suspicion,

however strong, is not enough; and a conviction based on mere suspicion of the guilt of the accused can not stand. *State* v. *Clay*, 135 W. Va. 618, 64 S. E. 2d 117; *State* v. *Crummitt*, 129 W. Va. 366, 40 S. E. 2d 852; *State* v. *Hudson*, 128 W. Va. 655, 37 S. E. 2d 553, 163 A.L.R. 1265; *State* v. *Beall*, 98 W. Va. 189, 126 S. E. 569; *State* v. *Chafin*, 78 W. Va. 140, 88 S. E. 657; *State* v. *White*, 66 W. Va. 45, 66 S. E. 20. See also *State* v. *Cutlip*, 131 W. Va. 141, 46 S. E. 2d 454; *State* v. *Mounts*, 120 W. Va. 661, 200 S. E. 53; *State* v. *Stutler*, 115 W. Va. 393, 176 S. E. 426.

The law requires the guilt of the defendant in a criminal case to be established, by competent evidence, beyond a reasonable doubt and the burden rests upon the State to prove the guilt of one accused of crime not merely by a preponderance of the evidence but by evidence sufficient to establish his guilt beyond a reasonable doubt. *State* v. *Hudson*, 128 W. Va. 655, 37 S. E. 2d 553, 163 A.L.R. 1265; *State* v. *Campbell*, 115 W. Va. 198, 174 S. E. 797; *State* v. *Scurlock*, 99 W. Va. 629, 130 S. E. 263; *State* v. *Dudley*, 96 W. Va. 481, 123 S. E. 241. This requirement has not been met or satisfied in this case, and the verdict of the jury, being without sufficient evidence to support it, should have been set aside by the trial court. *State* v. *Hudson*, 128 W. Va. 655, 37 S. E. 2d 553, 163 A.L.R. 1265; *State* v. *Chafin*, 78 W. Va. 140, 88 S. E. 657; *State* v. *White*, 66 W. Va. 45, 66 S. E. 20; *State* v. *Zeigler*, 40 W. Va. 593, 21 S. E. 763; *State* v. *Foster*, 21 W. Va. 767. The action of the trial court in refusing to direct a verdict of not guilty and, after the jury returned a verdict of guilty, in denying the motion of the defendant to set it aside and award the defendant a new trial constituted reversible error.

It was also error to admit the oral confession which the defendant made to the three arresting officers while he was in the custody of those officers who at the time were engaged in taking him from the place of his arrest to police headquarters in the city of Huntington. Before admitting the confession as testified to by each of the three officers, the trial court should have determined from evidence whether the confession had been freely and voluntarily made. This

the trial court did not do; instead it permitted each of the three officers to testify that the defendant told them that he committed the crime which they were investigating when their testimony concerning the confession showed that the confession was not made freely and voluntarily but instead was induced, procured or obtained by the threat of the officers to take him to the scene of the crime and the body of the deceased unless the defendant told them what they wanted to know about the murder for which they were holding him as a suspect. The express testimony of the three officers which disclosed the involuntary character of the confession rendered it inadmissible. For that reason the trial court, having been previously informed by the opening statement of the prosecuting attorney that the State would introduce the oral confession of the defendant, should have heard, in the absence of the jury, the evidence concerning the means by which it was induced or obtained and, after so having heard such evidence which was entirely undisputed, should have refused to permit the introduction of the confession in evidence and its consideration by the jury.

The first version of the confession was given by Officer Coleman. He testified that the officers placed the defendant "in the patrol car and started down 8th Avenue and on the way down we decided to stop at the scene of the crime and *take him in to view the remains at the Atlantic Sea Food Store* and Detective Salyers stopped the car in about fifty feet of the place *and we proceeded and started to take the defendant inside* and he said what are you taking me in there for and Detective Tomlinson said don't you want to go in there and he said I don't want those people to look at me and Detective Tomlinson said why don't you want to go in there, why don't you want to go inside and he said I don't want to go and Detective Tomlinson asked him if he wanted to tell us about it and he said I will tell you what you want to know when we get to headquarters and Sergeant Tomlinson said no, you tell us now, did you do it, and he said yes, I did.", and that they then "Took him to the police station. * * * ." (Emphasis supplied). Though there was no objection to this testimony at the time it was given, a defense motion to strike it, which was sufficient to challenge

its admissibility and to save the point, was made at the conclusion of the testimony of the witness and was overruled by the court.

The second version of the confession was given by Officer Salyers who testified that the officers placed the defendant in the cruiser and started down 8th Avenue, that the defendant "informed us that he knew nothing about this murder etc., and couldn't understand why he would be wanted or why we wanted to talk with him and we drove West on 8th Avenue and pulled up in front of 1642, 8th Avenue, which was the Atlantic Food Shop and we told him that we *were going to take him inside* and in the meantime everybody was asking him to give us the information that we were seeking and tell us all about it and he, like I said, insisted that he knew nothing about it and at that time *we started to take him out of the car and take him into the Sea Food Store,* he told us that he didn't want to face all those people and he said he would tell us what we wanted to know and Sgt. Tomlinson informed him that *he would tell us then or we were going to take him inside* and he again stated that he didn't want to go inside where all those people were and face all those people and Sgt. Tomlinson asked him, he said, did you kill Mrs. Davis and he said, yes, sir, I did." (Emphasis supplied.) The witness further testified that they did not get out of the car, that he informed the chief of police that the accused had admitted the offense, and that they then took the defendant to police headquarters. The defendant objected to all this testimony but his objection was overruled by the trial court.

The third version of the confession was given by Officer Tomlinson who, after stating that the officers found the defendant at the home of his sister, testified "we told him that we were going to arrest him and charge him with homicide and he kept denying it, so then we put him in the car and brought him down 8th Avenue, that was Officer Coleman, Detective Salyers and myself and we stopped in front of the Atlantic Sea Food Shop, not directly in front but about fifty feet East of it I guess and *I told him I was going to take him inside the place of business. He said don't do that,* he said

I will tell you what you want to know or something to that effect, so I said, did you commit this crime — He said I will tell you when we get to headquarters and *I said no, I want to know now and he said don't take me inside.* I will tell you when we get down to headquarters and I said I want to know now did you commit this crime and *he said, yes, I did, please don't take me inside,* take me to headquarters. After he told me that he committed the crime we proceeded to police headquarters with him." (Emphasis supplied). This testimony was objected to by the defendant but this objection was overruled.

It is clear beyond question, from the testimony of these officers, that this confession was obtained from the defendant without advising him of his legal rights or informing him that he could refuse to make any statement or that any statement by him should be freely and voluntarily made or that any statement by him would be used against him. On the contrary the conduct of the officers was in the nature of a demand that he confess his guilt and submit to voluntary self-incrimination. It is equally clear that he was forced to confess that he committed the crime by the threats of the officers who made it clear that unless he did so they would take him forcibly to the scene of the crime and the remains of the deceased, that he confessed that he committed the crime for the sole and only purpose of preventing the officers from consummating such threat, that the only way he could cause them to desist from their efforts to carry out the threat and he could avoid its accomplishment was to make such confession immediately, and that because he confessed to the crime he was not required to go to the scene of the crime or to view the remains of the deceased. It is evident that the officers would have carried out the threat to take him to the scene and the remains of the deceased if he had not confessed that he committed the crime. They were in the act of executing their threat when he confessed and they did not cease their efforts until he did confess. A confession so obtained is not a voluntary confession but is a confession which results from compulsion and for that reason is clearly not admissible in evidence.

This Court has held that "It devolves upon the trial court in the first instance, before admitting it, to determine from evidence whether a confession of guilt has been freely and voluntarily made, and not under duress or *threats* or by some inducement made or held out to the accused by someone in authority, of benefits or reward of a worldly or temporal character, or in mitigation of punishment; and the burden is upon the State to show to the satisfaction of the court facts justifying the admission of such confession. Point 3, syllabus, *State* v. *Brady,* 104 W. Va. 523, 140 S. E. 546; Point 6, syllabus, *State* v. *Bruner,* 143 W. Va. 755, 105 S. E. 2d 140; Point 4, syllabus, *State* v. *Vance,* 146 W. Va. 925, 124 S. E. 2d 252. (Emphasis supplied).

In obtaining the confession of the defendant by the threat to take him to the scene of the crime the officers violated the requirement of the law that a confession of guilt must not be obtained by the threat of someone in authority; and the action of the trial court in admitting a confession so obtained, being contrary to the requirement that a confession of guilt to be admissible must have been freely and voluntarily made, constituted reversible error.

The action of arresting officers in the exercise of the power of inquisition through duress of prisoners in their custody is discussed at length and condemned in the opinion delivered by Judge Maxwell, in *Floyd* v. *Chesapeake and Ohio Railway Company,* 112 W. Va. 66, 164 S. E. 28, in this language:

"The peace and good order of society depend in no small measure upon the efficiency of the custodians of the law, who not infrequently risk their lives in public service. In their faithful and proper discharge of duty they are to be encouraged and upheld. But their zeal must not outweigh their discretion. That they may interrogate prisoners with reference to matters under investigation may not reasonably be gainsaid *(State* v. *Richards,* 101 W. Va. 136, 132 S. E. 375); in fact it is ordinarily highly desirable that they do so, but such interrogation must be within proper and reasonable bounds. That the temptation to exceed proper bounds is great and the provocation often acute does not in

any sense justify the officers in turning lawless themselves. Such official lawlessness may manifest itself in a multitude of refinements of physical violence, crass and stupid or subtle and acute; or it may be of a purely mental type. The devices are many, but the object is always the same, namely, to force confession of guilt or the disclosure of facts which will lead to other developments. One of the plans often employed is to obtain the prisoner *incommunicado* in jail, or in a place other than a jail or lockup as in this case.

"The fact that this entire class of conduct involves flagrant violation of constitutional guarantees does not seem to deter those who see fit to indulge in it. That the employment of so-called 'third degree' methods in dealing with suspected criminals are neither expedient nor efficient is demonstrated by the fact that, in England, according to the best information obtainable, such methods among police officers are practically unknown, and it is common knowledge with us that among the British the enforcement of the criminal law is of a high degree of efficiency.

"To a suggestion that there is no inherent injustice in obtaining from a criminal a confession through physical or mental suffering far less than he has afflicted on his victim, the obvious reply is that the inevitable destructive and demoralizing effect of such practices upon the administration of the criminal law condemns the conduct as both barbarous and impractical. And then, too, the accused may be wholly innocent. The officers may have the wrong man. Statistics disclose that this has happened frequently. (This very plaintiff was discharged by the commissioner because of insufficient evidence against him.) When an arresting officer arrogates to himself punitive powers, he becomes a lawbreaker and should be dealt with as such. Police inquisition by compulsion cannot be tolerated or condoned if the organic law of the nation and states is to remain paramount. Such conduct is inherently at variance with fundamental American concepts of right and justice.

"The defense of 'third degree' methods is built on the postulates, first, that they are necessary, and second, that constitutional methods of procedure must yield to practicality.

Both propositions are unsound. The unsoundness of the first is demonstrated by the satisfactory results which obtain where such methods are not employed, and the second is refuted by the inherent truth of the homely maxim, 'Two wrongs do not make a right.'

"Much difference may exist in the kinds of unlawful pressure brought to bear upon prisoners; some of it may be much more revolting than other, but the primary question remains the same, namely, has the prisoner been deprived of his constitutional rights? 'No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers.' Const. of West Virginia, Art. III, sec. 10. 'Due process' means procedure which follows those 'rules and forms, which have been established for the protection of private rights * * * .' *Peerce* v. *Kitzmiller*, 19 W. Va. 564. It is such procedure as is within the limits of those fundamental principles of liberty and justice which underlie our civil and political institutions. *Hurtado* v. *California*, 110 U. S. 516; *Ry. Co.* v. *Iowa*, 160 U. S. 380; *In re Kemmler*, 136 U. S. 436. No procedure is just which deprives a man of the opportunity to be heard respecting the justice of the punishment to be inflicted.

"The compelling of an arrested person, by physical or mental suffering, to admit participation in crime, is violative of still another constitutional guaranty, both State and Federal: No person, in any criminal case, shall be compelled to be a witness against himself. 5th Amdmt. Const. U. S.; Const. West Virginia, Art. III, sec. 5.

"Where are the Palladia of our liberty, if arresting officers, in the secrecy of secluded places, may with impunity apply to prisoners methods of the days of the rack and the wheel? This sort of thing—a relic of the dark ages—is revolting to enlightened, liberty-loving people and cannot be too severely condemned."

In 23 C.J.S., Criminal Law, Section 826a, the text contains these statements: "It is elementary law that a confession induced by threat or fear is involuntary and inadmissible, not only by statute in many jurisdictions, but also

at common law, "; and "If a confession was induced by threats, the degree of fear inspired is not material, since any threat which produces in the mind of accused apprehension of harm is sufficient to invalidate the confession. In fact, it has been stated that threats automatically invalidate the confession, and there is no need to measure their effect on the will of the victim." See *State* v. *Hinz,* 78 S. D. 442, 103 N. W. 2d 656. It is well settled that "Public policy requires the rejection of confessions obtained by means of threats, fear, violence, force, intimidation, coercion, or duress, since a confession obtained by such means is a flagrant violation of the principles of freedom and justice. Confessions induced by such means are excluded on several grounds. They may be excluded on the ground that they are testimonially untrustworthy, or on the ground that to use them would be in violation of rights guaranteed by the Constitution, such as the guaranty against compulsory self-incrimination." 23 C.J.S., Criminal Law, Section 826c.

Though on conflicting evidence concerning the means by which a confession was obtained the confession was held to be admissible, this Court in *State* v. *Goldizen,* 93 W. Va. 328, 116 S. E. 687, used this language in stating the law with respect to the admissibility of a confession of guilt: "It is well settled by the decisions of this state and those of Virginia that a confession may not be given in evidence if it appears that it was obtained from the accused by some inducement of a temporal or worldly character in the nature of a *threat,* or some promise or benefit held out to the accused by which he may expect to escape from the consequence of his crime, or mitigation of punishment, by some one in authority or by some person with the apparent sanction of those in authority." (Emphasis supplied). See also *State* v. *Mayle,* 108 W. Va. 681, 152 S. E. 633. Here the defendant confessed because he had to do so to prevent his enforced presence at the scene of the crime from which the body of the deceased had not then been removed, and by confessing that he committed the crime he escaped from what for him was a dreaded experience.

All the foregoing facts are established by the uncontradicted evidence of the officers who testified about the con-

fession made by the defendant; and these facts bring his confession within the prohibition prescribed by this Court in the *Goldizen* case.

In *State* v. *Parsons,* 108 W. Va. 705, 152 S. E. 745, this Court held in the syllabus that "When the representations of one in authority are calculated to foment hope or despair in the mind of the accused to any material degree, and a confession ensues, it cannot be deemed voluntary." In the opinion stating the law governing the admissibility of a confession as expressed in 3 Russel on Crimes, (5th Ed.) 478, this Court approved this quotation "But a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by *any sort of threats* or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * * A confession can never be received in evidence where the prisoner has been influenced by any *threat* or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted." (Emphasis supplied). A confession obtained by any degree of influence amounting to duress must be excluded because the law can not measure the effect of any such influence. *People* v. *Davis,* 399 Ill. 265, 77 N. E. 2d 703. Tested by the foregoing principles the admission of the oral confession of the defendant is almost incredible and is utterly unjustified.

The opinion in the *Parsons* case also contains these statements: "We cannot ascertain the part played by the statements of the officer, in prompting the confession. When the representations of one in authority are calculated to foment hope or despair" (the defendant hoped to escape and by confession succeeded in escaping from his enforced presence at the scene of the crime) "in the mind of the accused to any material degree, and a confession ensues, it cannot be deemed *involutary*. This is not an instance of mere adjuration * * * , but of adjuration accompanied by an inducement. The inducement invalidates the confession. Wharton's Crim. Ev. (10th Ed.), sec. 645-b."

In *State* v. *Zaccario,* 100 W. Va. 36, 129 S. E. 763, the prosecution introduced, over the objection of the defendant, evidence of an alleged confession by him, after his arrest, to the arresting officer, without first showing that it had been freely and voluntarily made, just as that fact was not, and could not have been, shown in the case at bar for the reason that the evidence of the arresting officers shows that the confession was induced by the threat to take the defendant to the scene of the crime unless he confessed that he committed the crime. The defendant in the *Zaccario* case, as did the defendant in the case at bar, denied that he made a confession. In that case this Court held in the syllabus that: "To render admissible evidence of an extra-judicial confession by an accused to one in authority, or some person acting under the apparent sanction of those in authority, it must appear that the confession was freely and voluntarily made and without previous inducements of a temporal or worldly character *in the nature of threats* or intimidation, or some promise or benefit held out to the accused by which he may expect mitigation of punishment or to escape from the consequence of his crime." (Emphasis supplied). In the opinion this Court used this pertinent and decisive language: "Confession of guilt by an accused is certainly not usual, natural or ordinary. *The State should have shown by affirmative testimony as a condition precedent to its admissibility that the confession was not made under inducements of fear or favor."* (Emphasis supplied). The *Zaccario* case is directly in point and shows that the oral confession was clearly inadmissible. That case alone should have controlled the decision in the case at bar and should have produced a reversal of the judgment of the trial court.

In *People* v. *Siemsen,* 153 Cal. 387, 95 P. 863, the Supreme Court of California said: *"The slightest* pressure, whether by way of inducement to confess, *or threat if confession is withheld,* is sufficient to require the exclusion of the confession." (Emphasis supplied).

In *People* v. *Berve,* 51 Cal. 2d 286, 332 P. 2d 97, in reversing a conviction of murder of the second degree because of the admission of an enforced confession, the opinion contains these statements:

"The use of confessions in a criminal prosecution obtained by force, fear, promise of immunity or reward constitutes a denial of due process of law both under the federal and state Constitutions requiring a reversal of the conviction although other evidence may be consistent with guilt. *Brown* v. *State of Mississippi,* 297 U. S. 278, 285-286, 56 S. Ct. 461, 80 L. Ed. 682; *Ashcraft* v. *State of Tennessee,* 322 U. S. 143, 64 S. Ct. 921, 88 L. Ed. 1192; *Malinski* v. *People of State of New York,* 324 U. S. 401, 65 S. Ct. 781, 89 L. Ed. 1029; *People* v. *Siemsen,* 153 Cal. 387, 394, 95 P. 863; see, *People* v. *Sarazzawski,* 27 Cal. 2d 7, 161 P. 2d 934.

' "Use of involuntary verbal confessions in State criminal trials is constitutionally obnoxious not only because of their unreliability. They are inadmissible under the Due Process Clause even though statements contained in them may be independently established as true. Coerced confessions offend the community's sense of fair play and decency. * * * Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society." *Rochin* v. *People of California,* 342 U. S. 165, 173-174, 72 S. Ct. 205, 210, 96 L. Ed. 183." ' See also *Daniels* v. *State,* 243 Ala. 675, 11 So. 2d 756, certiorari denied, 319 U. S. 755, 63 S. Ct. 1168, 87 L. Ed. 1708; *Brooks* v. *State,* 117 So. 2d 482.

In *Williams* v. *State,* 89 Okla. Cr. 95, 205 P. 2d 524, the defendants while under arrest for murder and prior to arraignment before a magistrate, were separately taken to a funeral home to view the body of the deceased and subsequently the defendant Williams was taken to the home of the deceased where the homicide was committed and there handcuffed to the bed until he decided to talk to one of the officers, who waited nearby for such an occurrence; and sometime later the defendant signed a written confession of guilt. The Criminal Court of Appeals declared that the action of a peace officer in taking the defendants to the funeral home to view the body of the deceased and in taking one defendant to the scene of the killing and handcuffing him to a bed, in an attempt to obtain confessions, was improper and that when a defendant has been given cruel and unusual treatment or has been promised benefits in order to

obtain from him a statement of confession, such facts should be considered as a violation of his constitutional rights and the due process clause of the federal and state Constitutions. In that case the later pleas of guilty of the defendants were accepted but the original sentence of death were modified to terms of life imprisonment. In so modifying the sentences the court held in points 1 and 2 of the syllabus that "Statements or confessions made to officers while defendants are under arrest and prior to being taken before an examining magistrate may be either voluntary or involuntary, depending upon the circumstances. If voluntary, they are admissible. If involuntary, they are inadmissible."; and that "The question of whether a statement made to a peace officer by a defendant while under arrest and prior to his arraignment before a magistrate is a voluntary or involuntary statement is a question of law for the court. It should be heard and determined in the absence of the jury. If the court determines that it is involuntary it should not be presented to the jury. If admitted as voluntary and on appeal this court determines it is involuntary or contrary to the Constitution of the United States, or this State, the case will be reversed." See also *State* v. *Hinz,* 78 S. D. 442, 103 N. W. 2d 656. This is exactly what the trial court should have done in the case at bar and is precisely what the trial court did not do. It is clear to me that its failure to follow the pronouncements of the Oklahoma court and of this court in *State* v. *Brady,* 104 W. Va. 523, 140 S. E. 546; *State* v. *Bruner,* 143 W. Va. 755, 105 S. E. 2d 140; and *State* v. *Vance,* 146 W. Va. 925, 124 S. E. 2d 252, was prejudicial error which requires reversal of its judgment convicting the defendant and imposing the sentence of death.

Without the clearly inadmissible oral confession of the defendant his conviction would not have been possible and its erroneous admission in evidence was highly prejudicial to the defendant. The admission of incompetent evidence, here the involuntary oral confession of the defendant, is presumed to be prejudicial and is cause for reversal unless it appears, and it does not appear, that the verdict of the jury could not have been influenced by such evidence. *Slater* v. *United Fuel Gas Company,* 126 W. Va. 127, 27 S. E. 2d 436;

*Mitchell* v. *Metropolitan Life Insurance Company*, 124 W. Va. 20, 18 S. E. 2d 803; *State* v. *Stone*, 100 W. Va. 150, 130 S. E. 124; *Alford* v. *Kanawha and West Virginia Railroad Company*, 84 W. Va. 570, 100 S. E. 402; *State* v. *Tygart Valley Brewing Company*, 74 W. Va. 232, 81 S. E. 974; *Ewers* v. *Montgomery*, 68 W. Va. 453, 69 S. E. 907; *State* v. *Hull*, 45 W. Va. 767, 32 S. E. 240; *State* v. *Musgrave*, 43 W. Va. 672, 28 S. E. 813. The facts and the circumstances disclosed by this record do not overcome but instead sustain the presumption. It is utterly unthinkable to believe that in the absence of the oral confession the jury would have condemned him to death by its verdict of guilty of murder of the first degree as charged without recommendation that he be sentenced to life imprisonment in the penitentiary. The rule with respect to the effect of the admission of incompetent or illegal evidence announced and adhered to in the decisions of this Court has been stated in these words: "Where illegal evidence is admitted against the objection of a party, it will be presumed that it prejudices such party, and if it may have prejudiced him, though it be doubtful whether it did or not, it will be cause for reversal of the judgment; but, if it clearly appear that it could not have changed the result if it had been excluded, it will not be cause for reversing the judgment." Point 1, syllabus, *State* v. *Hull*, 45 W. Va. 767, 32 S. E. 240; *State* v. *Musgrave*, 43 W. Va. 672, 28 S. E. 813.

The third error which calls for reversal of the judgment is the clearly established and unquestioned misconduct of the jury in its consideration and decision of this case. This misconduct was flagrant and persistent and was violative of both the mandate of the statute and the express command of the trial court. Though the statute, Section 6, Article 3, Chapter 62, Code 1931, as amended, does not, as formerly, forbid the separation of the jury in a capital case it expressly directs that, after a jury in a case of felony punishable by death is impaneled and sworn, the jury shall be placed in the custody of the sheriff or other officers designated by the court until they agree upon a verdict or are discharged by the court and that neither the sheriff nor other officer shall converse with or permit anyone else to converse with a juror

unless by leave of the court. Before each adjournment the trial court told the jurors that they would be placed in the custody of the sheriff when absent from the courtroom, that they should not become separated from each other, and that they should not discuss the case with each other or permit anyone to discuss it with them or in their presence. Notwithstanding the command of the statute and the instructions of the trial court, the members of the jury, though technically in the custody of two deputy sheriffs, while spending two nights in a hotel, were actually separated into small groups on four different floors of the building and most of them during most of the time were out of the presence of the officers. This occurred while the jurors were going to and from their various rooms, and in meeting each morning in the lobby of the hotel, to which place most of them went unaccompanied by either of the officers. Sometime after the evening meal and until about midnight during each of the two nights at the hotel, at least five members of the jury engaged in a card game in a room regularly occupied by three jurors and the jurors who came to that room did so and left while unaccompanied by any officer. In fact, the jurors were not only separated into groups of two, three or four members but were supervised in a manner which permitted them to go, singly or in groups, to and from their rooms on different floors and to the lobby while unattended by an officer. Most of them could have left the hotel after they went to their room to spend the rest of the night, without being detected by the officers, if they had desired to do so. Television and radio sets were in some of the rooms occupied by the jurors and some of them watched some television programs. Several jurors made telephone calls from the hotel and to the hotel telephone operators. Though all of the jurors who made such calls, most of which were to their wives, testified that they did not in such calls discuss the case, and in this they are corroborated by the wives who also testified, and that they did not see or hear any television or radio broadcasts concerning the case, there was ample opportunity for them to communicate by telephone concerning the case with persons outside the hotel or to the telephone operators at the hotel desk who did not testify about

the calls made to them. Though the hotel kept a record of telephone calls from the rooms to persons outside the hotel, it kept no record of telephone calls from outside the hotel to any of its guests and in consequence there is no way to determine, except from the jurors, whether any persons outside the hotel called and talked by telephone to any of the members of the jury.

This Court in cases under the prior statute which forbade the separation of the jury in a felony case has considered the effect, in various circumstances, of separation by and misconduct of a jury during the trial of a felony case. In *State v. Robinson*, 20 W. Va. 713, in which the defendant was convicted of murder of the first degree and the sentence of death was imposed, this Court stated the rule to be applied to cases involving the improper separation of and misconduct by a jury in the trial of a felony case and held in Points 15 and 16 of the syllabus that "A mere separation of the jury will not entitle the person to a new trial; but where there has been an improper separation of the jury during the trial, if the verdict is against the prisoner, he is entitled to the benefit of the presumption, that such separation has been prejudicial to him, and the burden of proof is upon the prosecution to show beyond a reasonable doubt, that the prisoner has suffered no injury by reason of the separation. If the prosecution fails to do this, the verdict will be set aside. "; and that "The same rule should be applied, to all cases of misconduct or irregularity by the jury during the trial which is of such a character as to raise a presumption that the prisoner was prejudiced thereby." This Court also said in Point 17; of the syllabus, that in any such case the testimony of jurors should be received with great caution. The foregoing rule has been adhered to and approved in numerous subsequent cases. *State v. Muncey*, 102 W. Va. 462, 135 S. E. 594; *State v. Cottrill*, 52 W. Va. 363, 43 S. E. 244; *State v. Clark*, 51 W. Va. 457, 41 S. E. 204; *State v. Cotts*, 49 W. Va. 615, 39 S. E. 605, 55 L.R.A. 176; *State v. Harrison*, 36 W. Va. 729, 15 S. E. 982, 18 L.R.A. 224.

In the *Robinson* case two jurors were permitted by the officer in charge of the jury to enter and remain for some

time in a hotel toilet while two other persons were in or had entered the toilet, though it did not appear that any conversation occurred between the jurors and such persons, and sealed letters were sent to and received by some of the jurors during the trial of the case. Concerning the separation of the jury this Court said in Point 18 of the syllabus that "Where two of the jury trying a felony-case were taken in charge of an officer to the foot of the stairs in a hotel, where the jury were staying, and then the officer left them and they went into a water-closet, and a stranger had just gone into the closet before them and, afterwards another stranger went into the same water-closet, and the officer's back was turned on them, when the stranger went into the closet, and the two jurors remained in the closet some time in the absence of the officer with the strangers, this is such a separation of the jury, as will entitle the prisoner to have the verdict set aside and a new trial granted, though there be no evidence, that conversation was had between the strangers and the two jurors while in the closet, about the case then on trial. And the presumption, that the prisoner was prejudiced by such separation of the jury, is not rebutted by the several affidavits of all the jurors and the officers having them in charge made before the affidavits of such separation, that there was no separation of the jury during the trial and no opportunity offered any one to tamper with the jury." As to the reception of the letters this Court also said in Point 21 of the syllabus that "The reception of sealed letters by jurors during the trial of a felony, and especially a capital case, renders the verdict vicious; and it should be set aside and a new trial granted the prisoner, who has been convicted, although the jurors in the absence of the letters swear, that none of such letters so received in any manner related to the case on trial."

In *State* v. *Muncey,* 102 W. Va. 462, 135 S. E. 594, in which the defendant was convicted of murder of the second degree this Court set aside the verdict because as shown by affidavits one of the jurors left the courtroom during the trial and remained alone for several minutes in another room with a person who called the juror from the courtroom. In

that case this Court reaffirmed and adhered to the rule stated in the *Robinson* case.

The opinion in the *Muncey* case contains these statements:

"The rule at common law required the jury to be kept together in both civil as well as criminal cases. It was much more rigid than now obtains in felony cases. The reason of the rule was two-fold. First, it tended to prevent intemperance on the part of the jury and accelerate the finding of the verdict. To this end, unless permitted by the court, they could not have meat, drink, fire, or candle, until they reached an agreement. Second, it prevented them from having any communication with any of the parties interested and from receiving any fresh evidence in private, and any violation of the rule in these latter respects vitiated the verdict. * * * .

"The affidavits in this case disclose the very loosest practice in the management of the jury—a practice that is detrimental to the interests of justice and hazardous to the life and liberty of the citizens. It may be that the juror in question was not improperly influenced, but as we have seen that consideration does not satisfy the law. The facts here reveal an opportunity to improperly influence a juror. The burden is cast upon the State to rebut the presumption. It has made no attempt to do so. The record fails to disclose any reason for its inaction. This Court will not disturb a verdict on account of such separation where the State has rebutted the presumption that such separation has been prejudicial to the prisoner by proof that nothing improper happened during such separation. In showing this the court has gone to the extent of allowing jurors to testify, within certain limits. *State* v. *Cotts, supra.* The act complained of here was of such character as clearly tended to excite suspicion and thus bring reproach upon the administration of justice. A proper vigilance demanded in a trial of a case of this magnitude, on the part of the court and court officials, would have prevented this situation. Charged by the law with the duty of explaining such misconduct, the State's representatives sat supinely by and made no effort to do so. It is such uncalled for derelictions of duty on their part that is justly creating in the minds of the people a feeling of resent-

ment over the law's delays. Under the proper rule as ascertained from the position generally taken by the American Courts and the policy of the law, and so firmly established in this State as to not be overthrown or departed from, we are constrained, although reluctantly, to hold that the unexplained separation shown here is such as to demand a reversal of the case."

The misconduct of the officers in the case at bar was careless and irresponsible; that of the jurors disobedient and inexcusable. The slight degree of supervision exercised by the officers left the jurors free to go unattended by any of the officers to almost any part of the hotel, or even to leave it, without detection; and to place at will telephone calls to any person. The difference between the unrestricted movements within the hotel of the jurors who placed telephone calls to their wives and an undetected visit by them to their homes there to talk to their wives directly instead of by telephone is only a difference of degree. As stated in the opinion in *State v. Robinson,* 20 W. Va. 713, that "No one would say, if a jury disregarding the charge of the court should separate and go among a crowd of people, that the verdict rendered by them against a prisoner in a felony case ought not to be set aside, although every juror might swear, that he had no conversation with any one on the case they were trying, and heard nothing said by others in relation thereto.", I assume that no one would assert that the verdict which condemns the defendant to death should not be set aside if the telephone conversing jurors had carried on the same conversation with their wives at home and they and their wives had sworn that such conversation did not relate to the case on trial.

Manifestly the separation of and the misconduct by the jury were sufficient to create the presumption that such actions were prejudicial to the defendant and in my opinion the testimony of the officers, the jurors and their wives did not show beyond a reasonable doubt that he had not suffered injury by reason of such separation and misconduct and, for that reason alone, the verdict should be set aside.

The testimony of the jurors, which the defendant is necessarily unable to controvert, should be received and considered with the utmost caution inasmuch as the jurors would naturally be inclined to deny or to refrain from disclosing any misconduct which other sources of information could not furnish or make known; for no one except the jurors themselves knows, or can know, what the individual jurors actually did during the frequent and considerable periods of time that they were unattended by either of the officers to whose custody they were committed by the trial court.

The realization that a defendant, in a capital case, has been condemned to death, upon facts dependent on equivocal circumstantial evidence and an involuntary confession obtained by means of the threat of the arresting officers, by a jury whose misconduct in disobedience of the command of the trial court not to separate from each other is unquestioned and at least five of whose members spent some time during each of the two nights immediately preceding the rendition of the verdict in a game of cards, instead of reflecting upon their awesome responsibility of determining whether the defendant should live or be put to death, is so shocking to my sense of fairness, humanity, decency, and justice that I am constrained by the dictates of reason and of my conscience to dissent from any judgment which confirms the verdict of the jury in this case.

If the defendant is guilty of this brutal killing, as the prosecution contends he is, he can doubtless readily be convicted in a new trial upon competent evidence by a jury which would comply with the mandate of the statute and obey the command of the trial court concerning its conduct during such trial. But whether he is guilty or innocent of the crime with which he is charged, he is entitled to and should be given a fair trial and, without any reflection whatsoever upon any official participant, this, in my opinion, he did not receive during the proceedings which resulted in his conviction.

For the reasons stated and under the authorities cited and quoted from in this opinion, I dissent from the decision of the majority and, being in complete disagreement with that de-

cision, I would reverse the judgments of the circuit court and the common pleas court, set aside the verdict of the jury, and award the defendant a new trial.

Judge Given participated in the decision of this case and dissented on the ground that the admission of the oral confession of the defendant and the separation and misconduct of the jury constituted reversible error and, but for his death before the preparation of the majority opinion and this dissenting opinion, he would have concurred in the views expressed in this dissent with respect to the admission of the oral confession and the misconduct of the jury.